IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
Submitted on Briefs September 14, 2010

## STATE OF TENNESSEE V. BILLY RAY IRICK

No. M1987-00131-SC-DPE-DD - Filed September 22, 2010

**Appeal as of Right from the Criminal Court for Knox County
No. 24527   Richard Baumgartner, Judge**

The appellant, death-row inmate Billy Ray Irick, challenges the trial court's order of August 20, 2010, finding that he is presently competent to be executed according to the standards enunciated in Panetti v. Quarterman, 551 U.S. 930 (2007), Ford v. Wainwright, 477 U.S. 399 (1986), and Van Tran v. State, 6 S.W.3d 257 (Tenn. 1999).  Applying de novo review, we hold that the trial court applied the correct legal standards in adjudicating the question of the appellant's present competence for execution.  Additionally, after carefully and thoroughly reviewing the record on appeal, we conclude that the evidence fully supports and does not preponderate against the trial court's factual finding that the appellant is presently competent to be executed.  Accordingly, the judgment of the trial court is affirmed.

**Judgment of the Criminal Court for Knox County Affirmed**

CORNELIA A. CLARK, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

C. Eugene Shiles, Jr., and Howell G. Clements, Chattanooga, Tennessee, for the appellant, Billy Ray Irick.

Robert E. Cooper, Jr., Attorney General and Reporter; Gordon W. Smith, Associate Solicitor General; James E. Gaylord, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; Leland Price and Kenneth Irvine, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I.  Procedural History

The appellant, Billy Ray Irick, was convicted on November 1, 1986, of first degree felony murder and two counts of aggravated rape of a seven-year-old girl.  The jury imposed

a sentence of death for Mr. Irick's first degree murder conviction, and the trial court imposed forty-year concurrent sentences for the aggravated rape convictions.  See State v. Irick, 762 S.W.2d 121, 124 (Tenn. 1988), cert. denied 489 U.S. 1072 (1989).  This Court affirmed Mr. Irick's convictions and sentences on direct appeal.[1]  Irick, 762 S.W.2d at 135.  Thereafter,

---

[1] This Court's decision on direct appeal includes the following summary of the proof offered at trial.

> [T]he State's proof was that Billy Ray Irick was a friend of the child's mother and step-father.  He had lived with them for a time, often caring for the five (5) young children in the family while the [parents] were working. At the time of the incident the [parents] were separated.  [The step-father] and the defendant were living with [the victim's step-father's] mother. On the night of the occurrence [the victim's mother] left [Mr. Irick] with the children when she went to work. She was somewhat uneasy about this because [Mr. Irick] had been drinking, although he did not seem to be intoxicated. [Mr. Irick] was in a bad mood because he had been in an argument with [the stepfather's] mother earlier in the day. [Mr. Irick] did not want to keep the children since he planned to leave Knoxville for Virginia that night. [The victim's mother] called her husband at the truck stop where he worked to tell him of her fears. He reassured her and said he would check on the children.
>
> About midnight [the victim's step-father] received a telephone call from [Mr.] Irick telling him to come home, suggesting there was something wrong with the little girl, saying, "I can't wake her up." When [the victim's step-father] arrived at the house [Mr. Irick] was waiting at the door. The child was lying on the living room floor with blood between her legs. After ascertaining she still had a pulse, [the victim's step-father] wrapped her in a blanket and took her to Children's Hospital.  Efforts to resuscitate her there failed and she was pronounced dead a short time later.
>
> Physical examinations of her body at the hospital emergency room and during the autopsy were indicative of asphyxiation or suffocation. The cause of death was cardiopulmonary arrest from inadequate oxygen to the heart.  There was an abrasion to her nose near one eye and lesions on her right chin consistent with teeth or fingernail marks. Blood was oozing from her vagina, which had suffered an extreme tear extending into the pelvic region. There were less severe lacerations around the opening of her rectum in which semen and pubic hair were found.  These injuries were consistent with penetration of the vagina and anus by a penis.

Irick, 762 S.W.2d at 133-34.  After the victim was taken to the emergency room, Mr. Irick left the victim's home and was located by the police the next day hiding beneath a bridge.  When apprehended, Mr. Irick stated: "I have been hiding under the bridge all day, and several police cars have gone by and I had thought about turning myself in." Id. at 126.  After his arrest, Mr. Irick gave a statement to the police, in which he admitted killing the victim.  Id.  Mr. Irick "was responsive to questions asked of him," and "[h]e made a number of changes on his written statement before signing it."  Id.  While Mr. Irick "was upset and

(continued...)

-2-

Mr. Irick challenged his convictions and sentences in state post-conviction and federal habeas corpus proceedings, but these challenges were unsuccessful.[2] On May 10, 2010, after Mr. Irick had completed the standard three-tier appeals process, the State filed a motion asking this Court to set an execution date for Mr. Irick. On May 27, 2010, Mr. Irick filed a response to the State's motion, raising a claim of incompetency to be executed, and requesting a competency hearing under Van Tran v. State, 6 S.W.3d 257 (Tenn. 1999). On July 19, 2010, this Court granted the State's motion, set an execution date for December 7, 2010, and remanded the matter to the Criminal Court of Knox County for an expeditious determination of Mr. Irick's present competency in accord with the procedures and time limits set forth in Van Tran, 6 S.W.3d at 267-73.

Upon remand, Mr. Irick filed his petition to determine competency. On July 30, 2010, the trial court found that Mr. Irick had made the threshold showing necessary to obtain an evidentiary hearing.[3] Thus, the trial court ordered an evidentiary hearing on the issue of competency and appointed two mental health experts to evaluate Mr. Irick. The competency hearing was held on August 16 and 17, 2010. On August 20, 2010, the trial court entered an order finding Mr. Irick competent to be executed. In accord with Van Tran, 6 S.W.3d at 272, Mr. Irick has appealed the trial court's decision directly to this Court. The record of the competency hearing was filed in this Court on August 30, 2010. Mr. Irick filed his brief on September 3, 2010; the State filed its responsive brief on September 8, 2010; and Mr. Irick filed a reply brief on September 10, 2010. After determining that no extraordinary circumstances require oral argument, we have expeditiously and carefully reviewed the record and the briefs. See generally id. (setting forth the procedure that will be followed by this Court upon receiving the parties' briefs). For the reasons explained below, we affirm the judgment of the trial court.

---

[1](...continued)
emotional, . . . he was coherent at all times." Id.

[2]See Irick v. State, 973 S.W.2d 643 (Tenn. Crim. App. 1998), perm. appeal denied (Tenn. June 15, 1998), cert. denied 525 U.S. 895 (Oct. 5, 1998) (state post-conviction proceedings); Irick v. Bell, 565 F.3d 315 (6th Cir. 2009), cert. denied, ___ U.S. ___, 130 S.Ct. 1504 (Feb. 22, 2010), reh'g denied, ___ U.S. __, 130 S. Ct. 2142 (Apr. 19, 2010) (federal habeas corpus proceedings).

[3]A death-row inmate challenging competency to be executed will not receive a hearing on remand unless the inmate makes a threshold showing calling into question the inmate's present competency. This burden is met by the submission of affidavits, depositions, medical reports, or other credible evidence sufficient to demonstrate the existence of a genuine question regarding the prisoner's present competency. Van Tran, 6 S.W.3d at 269.

## II. Evidence at the Competency Hearing

Mr. Irick presented two witnesses at the competency hearing: Dr. Peter Brown, a forensic psychiatrist, and Ms. Nina Lunn, a licensed social worker. Mr. Irick also introduced into evidence various exhibits related to his history of mental illness.

Dr. Brown evaluated Mr. Irick on December 7, 2009, and January 21, 2010, meeting with Mr. Irick for almost six hours.[4] In addition to his own meetings with Mr. Irick, Dr. Brown also relied upon the neuropsychological testing and evaluation of Mr. Irick performed by Dr. D. Malcolm Spica, a licensed clinical psychologist and neuropsychologist, in November and December of 2009. Furthermore, Dr. Brown had reviewed Mr. Irick's school records, records from the various mental health facilities in which Mr. Irick had been institutionalized, records from the various mental health professionals who had treated and/or evaluated Mr. Irick during his life, portions of the transcripts and evidence offered at Mr. Irick's trial, portions of the proof introduced at the state post-conviction and federal habeas corpus proceedings, and records from the correctional facilities in which Mr. Irick has been incarcerated.

Dr. Brown candidly testified that the purpose of his evaluation had been to determine Mr. Irick's mental status at the time of the murder and to identify any mitigating circumstances. While Dr. Brown was aware of the guidelines and standards set forth by the American Academy of Psychiatry and the Law for the assessment of competence to be executed, he did not use these guidelines in a systematic way when conducting his evaluation. Furthermore, while Dr. Brown was aware of the competency standard outlined in Panetti, he did not focus upon this standard, explaining that "it did not relate to what I was doing." As for Mr. Irick's competency to be executed, Dr. Brown testified, "I don't have an opinion about that." When asked whether Mr. Irick "has a rational understanding of why he's going to be put to death," Dr. Brown responded:

> The best answer that I can give is that his rational understanding of events is that of a child in the seven-to-nine-year-old range. So that by the legal standards are obviously not my business, but the – his– the capacity of his brain to work in forming a rational understanding is in that of a pre-adolescent child.

---

[4]In its order of July 30, 2010, the trial court appointed Dr. Brown to evaluate Mr. Irick as to his competence to be executed and to submit a written evaluation within ten days of the order. The record does not reveal why Dr. Brown relied upon his earlier evaluation rather than performing an evaluation to determine Mr. Irick's present competency to be executed pursuant to the trial court's July 30 order. Counsel for Mr. Irick raised the claim of incompetency to be executed and surely understood the importance of having expert proof on that specific question.

Dr. Brown confirmed, however, that Mr. Irick was able to engage in a coherent conversation. Additionally, Dr. Brown agreed that a seven-to-nine-year-old child understands the concepts of doing wrong and receiving punishment.

Concerning Mr. Irick's mental condition generally, Dr. Brown testified that Mr. Irick has suffered from a lifelong severe psychiatric illness and that at the time of the offense he was suffering from psychosis. Through Dr. Brown, Mr. Irick introduced evidence concerning his past diagnoses of mental illness, evidence of his potentially violent actions during his teenage years, and evidence of his psychotic behavior around the time of the victim's murder.

Dr. Brown diagnosed Mr. Irick as suffering from a psychotic disorder not otherwise specified.[5] This psychotic disorder is a condition manifested by gross perceptual and thinking deficits, such as hallucinations, delusions, and gross disorganization of behavior. Dr. Brown believed that Mr. Irick's expressed inability to remember the offense was genuine; he did not believe Mr. Irick was malingering or pretending to have lost his memory. Dr. Brown opined that Mr. Irick's inability to remember the offense is the result of the psychotic episode Mr. Irick was experiencing at the time of the offense. Dr. Brown explained that persons suffering psychoses typically do not have "good recollection" of events occurring during psychotic episodes. At the same time, Dr. Brown acknowledged that Mr. Irick is able to recall events from his childhood, from the evening of the murder, and from his trial. Dr. Brown also acknowledged that during psychological evaluations conducted not long after the crime, Mr. Irick admitted he had been drinking alcohol on the day of the offense and that he had felt "angry," "enraged," "degraded," and "humiliated" by the family's request for him to babysit the children because he had planned to go out that evening.

Dr. Brown opined that Mr. Irick's mental problems continue to the present time, although he agreed that Mr. Irick showed no evidence of thought disorder, acute hallucinations, or delusions during their interview. Dr. Brown's diagnosis was based on Mr. Irick's history; however, Dr. Brown acknowledged that there have been no documented episodes of psychosis during Mr. Irick's incarceration at the Riverbend Maximum Security Institution. Dr. Brown also acknowledged that Mr. Irick has responded well to the structured environment of prison and that he has not been prescribed anti-psychotic medication since adolescence. Dr. Brown opined that the "best examples" of Mr. Irick's psychotic behavior were contained in the lay affidavits provided by members of the victim's family in 1999 during federal habeas corpus proceedings. These affidavits related that Mr. Irick reported hearing voices, talked to himself, and acted violently toward others in the days leading up to

_____

[5]The designation "not otherwise specified" or "NOS" means that Dr. Brown had inadequate information to make a more specific diagnosis.

the 1985 rape and murder of the victim. Specifically, the persons providing these affidavits stated that Mr. Irick talked aloud to himself and told family members that he was receiving commands from the devil and hearing other voices telling him what to do. Mr. Irick also professed to hearing police sirens and warned family members to protect themselves because the police were coming to kill them. On another occasion, Mr. Irick was seen "in broad daylight" with a machete chasing a girl with whom he had no relationship down the street. On another occasion, Mr. Irick was found with a machete inside the house where he and the victim's step-father were living and, when asked about the machete, said that he was going to kill his friend, the victim's step-father. Dr. Brown agreed that these affidavits constituted the most recent reports of any psychotic episodes.

Dr. Brown acknowledged that Mr. Irick denied having any memory of the events recounted in the affidavits and further denied having any psychological impairment. Dr. Brown explained that a person suffering from paranoia and psychosis has a tendency to minimize or deny symptoms, meaning "the most reliable information" is typically the reports of third parties witnessing the symptoms. In Dr. Brown's view, all the data from Mr. Irick's childhood, including a report that at age six he expressed fear of his own impulses and felt threatened by those in his environment, were consistent with a severe psychiatric condition. Dr. Brown explained that psychotic symptoms tend to wax and wane according to circumstances, with emotional conflict serving as a trigger for a psychotic episode. Dr. Brown opined that the marital strife between the victim's mother and step-father at the time of the murder likely amounted to a trigger for Mr. Irick's pyschosis.

Dr. Brown also diagnosed Mr. Irick as suffering from cognitive disorder not otherwise specified, a condition manifested by significant problems in the processing of information that does not meet the criteria for a specific diagnosis of a dementia, such as Alzheimer's, and that has no alternative explanation. This diagnosis was based upon the neuropsychological testing performed by Dr. Spica and was consistent with Mr. Irick's history. The neuropsychological testing indicated gross impairment in Mr. Irick's executive function, relating to his ability to integrate information from various processes in order to make decisions, to plan, and to control impulses. A person having this disorder, Dr. Brown explained, would not be able to resist paranoid delusions or command hallucinations. Dr. Brown further explained that this condition affects memory. Mr. Irick also has gross deficit in language function, Dr. Brown stated, meaning that his ability to use words as props to structure memory is impaired.

While Dr. Brown ruled out schizophrenia, he diagnosed Mr. Irick with paranoid and schizoid personality disorders. According to Dr. Brown, the paranoid personality disorder manifests itself in Mr. Irick's inability to evaluate people because of "his level of suspiciousness and his tendency to be looking for attacks, verbal, physical, whatever . . . from

a variety of different places at different times." Dr. Brown testified that the schizoid personality disorder manifests itself in Mr. Irick's "gross disorganization." Dr. Brown opined that it is "impossible to find a time in Mr. Irick's life when he was succeeding at meeting the goals and standards of his age group and that his primary way of coping" has been to withdraw from people.

Overall, Dr. Brown found evidence of two significant features based on his diagnoses of four psychological disorders. "One is a lifelong severe psychiatric illness and evidence of episodes from reliable reporters of some of the most severe and the most dangerous psychiatric symptoms." The second is the clear evidence of gross impairment of Mr. Irick's "ability to control, plan, and effectively execute or refrain from engaging in behavior with his cognitive disorder." Nevertheless, when Dr. Brown asked Mr. Irick about his general understanding of his present situation, Mr. Irick explained that he was on death row and expected to be executed. Mr. Irick expressed awareness of the offense he had committed and the victim's name, and he understood Dr. Brown's explanation of his own role and the reason Dr. Brown was examining Mr. Irick and preparing a report for the court.

The second witness for Mr. Irick, Nina Braswell Lunn, was a licensed social worker who had interviewed Mr. Irick in 1965, when he was a child. The sole subject of Ms. Lunn's testimony was Mr. Irick's childhood psychiatric problems and institutionalizations. Ms. Lunn had not seen Mr. Irick since 1967.

The State presented one witness at the hearing, Dr. Bruce G. Seidner, a clinical and forensic psychologist. Dr. Seidner interviewed and tested Mr. Irick on August 14 and 15, 2010, the weekend before the hearing, for a total of twelve and a half hours. Dr. Seidner also prepared a written report that the State introduced into evidence. Dr. Seidner explained that the purpose of his examination was to evaluate Mr. Irick's competence for execution. Dr. Seidner stated that he had followed the professional guidelines for assessing competence to be executed in conducting his evaluation. Dr. Seidner acknowledged Mr. Irick's long history of mental illness and substance dependence; and he considered Mr. Irick's background of behavioral, psychological, and substance abuse problems when forming his opinion on competence for execution. However, Dr. Seidner's evaluation focused upon Mr. Irick's current mental status, not his mental status at the time of the offense.

According to Dr. Seidner, Mr. Irick was entirely cooperative during the evaluation. Mr. Irick voluntarily and knowingly signed a consent form. When asked if he knew why Dr. Seidner was there, Mr. Irick replied, "Yeah. Yeah. One side wants to kill me, and one side wants to save me, and you know, you're–you're here to interview me to see if I'm competent to be executed." Dr. Seidner had no doubt that Mr. Irick "knew what we were about." Dr. Seidner opined that Mr. Irick fully understood the history of his litigation and felt that

substantive errors had been made in his case. Mr. Irick believed, given the structure, and procedure, and rules of court, that he has now "run out of road." Mr. Irick told Dr. Seidner that he intends "to fight to the end," which Mr. Irick views as his execution on December 7, 2010. Dr. Seidner confirmed that Mr. Irick knows the date of his execution, the victim's name, the victim's relationship to her family and to him, and his relationship to the victim's family. Mr. Irick admitted that he had been angry with the family about being asked to babysit on the night of the murder and said that he had been drinking and using marijuana that day. Mr. Irick maintained his innocence of the crime, however, and suggested that the victim's stepfather was the killer. Despite Mr. Irick's profession of innocence, Dr. Seidner opined that there is "no question" Mr. Irick understood that he had been convicted of the victim's murder and that he had received the death penalty as punishment for that crime.

Dr. Seidner and Mr. Irick also talked for some time about the death penalty and the pendency of Mr. Irick's death. Mr. Irick discussed the politics of the death penalty and his trial and expressed concern regarding the inconsistent application and the rationale for the death penalty. Still, according to Dr. Seidner, Mr. Irick was well aware of the sense of closure that families of victims might experience and of the justice of "a life for a life." They also discussed Mr. Irick's views of death, which he described as "a process of life." According to Dr. Seidner's report, Mr. Irick had adopted the Lakota Native American spiritual tradition before his incarceration. Mr. Irick believes that everything has a purpose and reason relative to the plans and intentions of the Creator. During his incarceration he has developed himself as an artist, and he is gratified by creating and sharing his paintings as gifts. Mr. Irick expressed his belief that everyone is born with a death sentence, and each person makes the most of life within the constraints and opportunities that originate from the Creator. However, Mr. Irick did not believe in an afterlife and accepted that his life would end with his execution. In Dr. Seidner's words, "He fully understands that if and when he is executed that is the end of his life."

Mr. Irick explained that while he continues to pursue legal avenues, he also is "realistic" and has been contemplating his choice of death by electrocution or lethal injection. According to Dr. Seidner, Mr. Irick was knowledgeable of the facts related to both methods and believed that his choice among the two will likely be his last major life decision.

Dr. Seidner administered an IQ test, which revealed that Mr. Irick was of average intelligence (full scale IQ of 97). While Mr. Irick described some memory deficits, Dr. Seidner did not observe any that were outside the range of age-related memory decline. Dr. Seidner found nothing he would describe as an impairment. According to Dr. Seidner, the

personality test[6] results did not reflect that Mr. Irick was malingering but instead were indicative of Mr. Irick's tumultuous and traumatic life. Dr. Seidner opined that Mr. Irick "was not an individual who was hallucinating and having . . . delusory experiences." Dr. Seidner explained that Mr. Irick's relative deficits are in the speed of processing information and stated, "He's pretty deliberate . . . . [H]e's not efficient but he's accurate." Dr. Seidner found relative strengths in Mr. Irick's abstract verbal capacity: "He can put together ideas. He can abstract ideas, see their commonalities and differences and carry on pretty high level abstract discussions." On the basis of his evaluation, Dr. Seidner opined to a reasonable degree of psychological certainty that Mr. Irick is aware of the punishment he is about to suffer, that he understands the reason for that punishment, and that he has a rational understanding of his pending execution.

## III. Analysis
## A. Standard of Review

On appeal from a trial court's ruling in a competency proceeding, this Court reviews questions of law de novo, affording no presumption of correctness. See Van Tran, 6 S.W.3d at 272; see also Coe v. State, 17 S.W.3d 193, 199 (Tenn. 2000). However, the trial court's finding on the issue of competency is reviewed as a question of fact and presumed correct unless the evidence in the record preponderates against the finding. Van Tran, 6 S.W.3d at 272. At a competency hearing, the prisoner is presumed competent and, to prevail, the prisoner must overcome this presumption by a preponderance of the evidence. Id. at 271. In order to overcome this presumption, the prisoner must offer evidence relating to the prisoner's present incompetency. See id. at 269.

## B. Legal Standards of Competency

"The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane." Ford v. Wainwright, 477 U.S. 399, 410 (1986).[7] The Court in Ford did not define insanity, however, instead leaving to each state "the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." Id. at 416-17 (plurality opinion). In a concurring opinion in Ford, Justice Powell declared that the Eighth Amendment "forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." Id. at 422 (Powell, J., concurring). Justice Powell's concurring opinion in Ford constituted the narrowest grounds

---

[6]Dr. Seidner administered the Minnesota Multiphasic Personality Inventory-2.

[7]This prohibition on executing incompetent prisoners has its genesis in the common law and was recognized in Tennessee in Jordan v. State, 135 S.W. 327, 328 (1911), and even earlier in Bonds v. State, 8 Tenn. (Mart. & Yer.) 142, 143-44 (1827). See Van Tran, 6 S.W.3d at 262, 265.

for the Court's judgment.  See Coe, 17 S.W.3d at 209 (citing Marks v. United States, 430 U.S. 188, 193 (1977)).  As a result, many states and many lower federal courts adopted and applied Justice Powell's formulation of the standard of competence to be executed. Likewise, in 1999, this Court adopted the standard enunciated by Justice Powell and held that "under Tennessee law a prisoner is not competent to be executed if the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it."  Van Tran, 6 S.W.3d at 266; accord Coe, 17 S.W.3d at 219.

In Panetti v. Quarterman, 551 U.S. 930 (2007), the United States Supreme Court had an opportunity to revisit the issue of the standard for competence to be executed.  Scott Panetti, who had killed his estranged wife's parents in front of his wife and their daughter, had a lengthy history of mental illness.  Id. at 935-36.  He filed a petition in state court arguing that he was not competent to be executed.  Id. at 938.  His attorneys produced expert proof that, while Mr. Panetti understood that he would be executed and claimed to understand that the state wanted to execute him for the murders he committed, his mental illness had resulted in a delusion causing him to believe that the stated reason for his execution was a sham, and that the state actually intended to kill him to stop his preaching. Id. at 954-55.[8]  The state courts denied his claim, and he sought federal habeas corpus relief. The federal district court and the United States Court of Appeals for the Fifth Circuit denied relief, explaining that a prisoner is competent to be executed so long as the prisoner knows the fact of his impending execution and the factual predicate for the execution.  Id. at 941-42.

---

[8]The United States Supreme Court summarized the expert proof in Panetti as follows:

> Four expert witnesses testified on petitioner's behalf in the District Court proceedings.  One explained that petitioner's mental problems are indicative of "schizo-affective disorder," resulting in a "genuine delusion" involving his understanding of the reason for his execution.  According to the expert, this delusion has recast petitioner's execution as "part of spiritual warfare . . . between the demons and the forces of the darkness and God and the angels and the forces of light."  As a result, the expert explained, although petitioner claims to understand "that the state is saying that [it wishes] to execute him for [his] murder[s]," he believes in earnest that the stated reason is a "sham" and the State in truth wants to execute him "to stop him from preaching."  Petitioner's other expert witnesses reached similar conclusions concerning the strength and sincerity of this "fixed delusion."

551 U.S. at 954-55 (internal citations omitted).

-10-

The United States Supreme Court granted review and considered, as relevant to this appeal, the following question: "whether the Eighth Amendment permits the execution of a prisoner whose mental illness deprives him of 'the mental capacity to understand that [he] is being executed as a punishment for a crime.'" Id. at 954. In discussing this issue, the Court explained that the four-justice plurality in Ford "discussed the substantive standard at a high level of generality; and Justice Powell wrote only for himself when he articulated more specific criteria." Panetti, 551 U.S. at 957. While the Court in Panetti again declined "to set down a rule governing all competency determinations," id. at 960-61, the Court rejected the approach applied by the lower courts which treated a prisoner's delusional belief system as irrelevant so long as the prisoner also knows that the State has identified his crimes as the reason for his execution. Id. at 958. The Court emphasized that, "[w]hether Ford's inquiry into competency is formulated as a question of the prisoner's ability to 'comprehen[d] the reasons' for his punishment or as a determination into whether he is 'unaware of . . . why [he is] to suffer it,'" id. at 959, the Ford opinions "nowhere indicate that delusions are irrelevant to 'comprehen[sion]' or 'aware[ness]' if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution," id. at 958. The Court further explained that "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." Id. at 959.

The Court conceded that "a concept like rational understanding is difficult to define." Id. In attempting to clarify the concept, the Panetti Court stated:

> [W]e must not ignore the concern that some prisoners, whose cases are not implicated by this decision, will fail to understand why they are to be punished on account of reasons other than those stemming from a severe mental illness. The mental state requisite for competence to suffer capital punishment neither presumes nor requires a person who would be considered "normal," or even "rational," in a layperson's understanding of those terms. Someone who is condemned to death for an atrocious murder may be so callous as to be unrepentant; so self-centered and devoid of compassion as to lack all sense of guilt; so adept in transferring blame to others as to be considered, at least in the colloquial sense, to be out of touch with reality. Those states of mind, even if extreme compared to the criminal population at large, are not what petitioner contends lie at the threshold of a competence inquiry. The beginning of doubt about competence in a case like petitioner's is not a misanthropic personality or an amoral character. It is a psychotic disorder.

Id. at 959-960.

The Court also emphasized that the goal of retribution is served only if the prisoner is able to recognize "the severity of the offense and the objective of community vindication." Id. at 958. This goal is undercut, the Panetti Court explained, when the prisoner suffers from a form of mental illness that distorts his or her mental state to the point that the prisoner's "awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole." Id. at 958-59. The Court emphasized that "[g]ross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose." Id. at 960. The Court concluded that it is "error to derive from Ford, and the substantive standard for incompetency its opinions broadly identify, a strict test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted." Id.

The astute trial judge in this case correctly recognized that the competency standard adopted in Van Tran and applied in Coe must be construed and applied consistently with the foregoing principles enunciated in Panetti. The State's contention in this Court that Panetti is inapplicable and does not affect the standard announced in Van Tran is without merit. As Mr. Irick points out in his reply brief, the United States Supreme Court defines the parameters of the Eighth Amendment, and we are bound by Panetti, the Court's latest pronouncement on the standard of competence for execution. Any portions of Van Tran or Coe that can be read as inconsistent with Panetti are hereby renounced as obsolete.[9]

In our view, Panetti teaches that the test for competence to be executed requires a prisoner to have "a rational understanding of his conviction, his impending execution, and the relationship between the two." Billiot v. Epps, 671 F. Supp. 2d 840, 853 (S.D. Miss. 2009). See also Panetti v. Quarterman, No. A-04-CA-042-SS, 2008 WL 2338498, at *31 (W.D. Tex. Mar. 26, 2008) (opinion after remand from the United States Supreme Court). Stated differently, under Panetti, execution is not forbidden so long as the evidence shows that the prisoner does not question the reality of the crime or the reality of his punishment by

_____

[9]We note that the United States Court of Appeals for the Sixth Circuit has held that this Court unreasonably applied Ford in Thompson v. State, 134 S.W.3d 168 (Tenn. 2004), when determining whether the prisoner had made an initial threshold showing. See Thompson v. Bell, 580 F.3d 423, 435-36 (6th Cir. 2009) (holding that while the Tennessee Supreme Court properly identified the standard for determining competency when it stated Ford's rule that a prisoner must be able to understand the fact of the impending execution and the reason for it, it unreasonably applied Ford when it determined that Thompson's "severe delusions" were "irrelevant" to the competency analysis). To the extent our decision in Thompson can be read as inconsistent with Panetti, it is hereby overruled.

the State for the crime committed. See Overstreet v. State, 877 N.E.2d 144, 174 (Ind. 2007). The Court's decision in Panetti also emphasizes that a prisoner seeking to establish incompetency may not be foreclosed from offering proof to show that a mental illness obstructs his rational understanding of his conviction, his impending execution, and the relationship between the two.

As previously explained, the trial court in this case correctly identified and applied the governing legal principles announced in Panetti and Van Tran. Therefore, we must now consider whether the evidence preponderates against the trial court's finding that Mr. Irick is presently competent to be executed.

### C. Preponderance of the Evidence

We need not again recite in detail the proof offered at the hearing. In summary, the proof showed that Mr. Irick is familiar with the history and status of the litigation challenging his convictions and sentences. Although he professes his innocence, Mr. Irick understands that he has been convicted of murdering the victim, a seven-year-old girl, and that he is scheduled to be executed for this crime on December 7, 2010. Mr. Irick knows the victim's name and understands his relationship to the victim and her family. The experts agreed that Mr. Irick does not currently manifest any symptoms of formal thought disorder, hallucinations, or delusions. Mr. Irick's last alleged psychotic episodes were reported to have occurred in 1985, near the time of the murder. Mr. Irick has not been treated for mental illness during his incarceration, and Mr. Irick has not been prescribed anti-psychotic drugs since adolescence. While he intends to "fight to the end," Mr. Irick also understands that he has almost exhausted his legal avenues for relief. As a result, Mr. Irick is contemplating which method of execution to choose and believes that this choice will be the last major decision of his life. Mr. Irick recognizes that his execution will end his life. In short, the evidence in the record fully supports and does not preponderate against the trial court's finding that Mr. Irick is presently competent to be executed.

Mr. Irick argues that he is incompetent to be executed because his insanity at the time of the offense, the associated memory loss of those events, and his emotional and social functioning at the level of a seven-to-nine-year-old child prevent him from rationally understanding the events occurring during the criminal episode and therefore the reason for his execution. He argues that where a prisoner has no memory of the events surrounding the murder and believes that he is innocent and falsely accused, it is impossible for the prisoner to have a rational understanding of his execution. These arguments are without merit.

Mr. Irick's profession of innocence and suggestion that the victim's step-father committed the crime are in no way inconsistent with a rational understanding of the crime, the impending execution, and the causal connection between the two. Indeed, these actions

may be viewed as showing that Mr. Irick has a rational understanding that he stands convicted of the victim's murder and will be punished for that crime unless his innocence is established, perhaps by identifying the victim's step-father as the perpetrator. Mr. Irick's statements suggest that he understands the reality of the crime and the reality that he will be punished by the State for the crime.

Additionally, Mr. Irick's argument that he is incompetent because he has no memory of the circumstances of the crime is without merit. Dr. Seidner testified that Mr. Irick's memory deficits are "well within the range of age-related memory decline." Dr. Seidner explained that Mr. Irick "describes experiences that sound like he's got a history of some dissociative experiences." Dr. Seidner stated, "I considered that, but there's – there's no impairment of memory that I could find based on this testing, but it [memory] is a relative weakness, compared to the strengths of [Mr. Irick's] abstract capacities."

To the extent Mr. Irick is arguing that he has never had any recollection of the circumstances surrounding the crime, this argument is not consistent with the factual record developed during the litigation, in which Mr. Irick has challenged his convictions and sentences. As previously stated, after his arrest, Mr. Irick gave a statement to the police, in which he admitted killing the victim. Irick, 762 S.W.2d at 126. Mr. Irick "was responsive to questions asked of him," and "[h]e made a number of changes on his written statement before signing it." Id. While Mr. Irick "was upset and emotional, . . . he was coherent at all times." Id. Additionally, in state post-conviction proceedings, Mr. Irick testified about the events that occurred on the evening of the murder, although he professed his innocence.[10]

---

[10]The Court of Criminal Appeals described the proof as follows:

> In describing his recollection of the events occurring on the day of the murder, [Mr. Irick] stated that when he had arrived at the victim's house, he had gone "out back" to drink beer and had smoked marijuana with a friend. He testified that [the victim's mother] went to work[;] [the victim's step-father] left shortly thereafter[;] and he remained at the house alone with the . . . children. He put the children to bed and laid on the couch to watch television. Sometime during the evening, the victim came to the living room and told him that she was sick. [Mr. Irick] told her to "go back and lay down in daddy's bedroom" because that would be the first place where [the victim's mother] would find her.
>
> Later, [Mr. Irick] observed that the dog had come in. He stated that he had wondered how the dog had gotten in and that he had gone to the back door, noticing that something was not right because the back door was "wide open." He shut the back door and when he passed beside the room in which the victim was lying down, he stated that he observed the victim was not breathing because she always snored. He then called [the victim's

(continued...)

-14-

Mr. Irick maintains that his present memory loss indicates that he committed the crime during a psychotic episode. However, the focus of this proceeding is upon Mr. Irick's present competence to be executed. As previously stated, Mr. Irick has questioned neither the reality of the crime nor the reality of his punishment by the State for the crime. During his interview with the State's expert, conducted shortly before the competency hearing, Mr. Irick identified what he views as substantive errors made in his case and problems and political and societal issues with the application of the death penalty in general. Mr. Irick recalled the victim, his relationship to her and to her family, his anger at being asked to babysit on the night of the crime, and his abuse of alcohol and marijuana on the day of the crime. Mr. Irick explained that because he is "realistic" about his legal options, he had begun considering whether to choose electrocution or lethal injection as the method of execution. Whatever his mental state may have been at the time of commission of this crime, the evidence in this record clearly establishes that Mr. Irick now rationally understands that he has been convicted of murdering the victim and that he is scheduled to be executed by the State for this crime on December 7, 2010.

As his final issue, Mr. Irick argues that the trial court improperly foreclosed inquiry into his lack of a rational understanding of the reasons for his execution. This issue is without merit. The trial court allowed Mr. Irick's attorneys a great deal of leeway to inquire into Mr. Irick's history of psychological and behavioral problems and to question the witnesses concerning Mr. Irick's competence for execution. The trial court sustained the State's objection when Mr. Irick's counsel attempted to question the State's expert about Mr. Irick's mental state at the time of the offense. This ruling was entirely appropriate, as the State's expert did not attempt to determine Mr. Irick's mental state at the time of the offense. Significantly, however, when Mr. Irick's counsel rephrased the question to inquire into Mr. Irick's current rational understanding of his impending execution and the reason for it, the trial court allowed the question; and the State's expert provided a lengthy answer to the question. The record simply belies the assertion that the trial court precluded Mr. Irick from inquiring into whether he has a rational understanding of the reasons for his execution.

## D. Execution of the Severely Mentally Ill
Relying on Atkins v. Virginia, 536 U.S. 304, 321 (2002), which held that execution of the mentally retarded violates the Eighth Amendment, and Roper v. Simmons, 543 U.S.

---

[10](...continued)
　　　　step-father] and attempted to conduct CPR on the victim.

Irick v. State, 973 S.W.2d 643, 647 (Tenn. Crim. App. 1998).

551, 578 (2005), which held that the Eighth Amendment prevents the execution of juveniles, Mr. Irick argues that the rationale of these decisions supports adoption of a rule barring the execution of death-sentenced inmates who suffer from severe mental illnesses. The rule Mr. Irick seeks would apply to prevent the execution of prisoners who are severely mentally ill but unable to establish incompetency to be executed under the standards announced in Panetti, Ford, and Van Tran. In arguing that such a rule would prevent his execution, Mr. Irick relies upon Dr. Brown's findings that he has the functional capacity of a seven-to-nine-year-old child and that he has diminished capacity to understand and to process information, to communicate, to abstract and to learn from mistakes, to engage in logical reasoning, to control his impulses, and to understand the reaction of others.

The State responds that Mr. Irick's reliance on Atkins and Roper is misplaced because Mr. Irick is neither mentally retarded nor underage. Additionally, the State says that the time for asking this Court to adopt a new constitutional rule has long passed.

We agree with the State that the present appeal from the trial court's judgment finding Mr. Irick competent to be executed is not the proper proceeding in which to ask this Court to adopt a new constitutional rule barring execution of persons who suffer from severe mental illnesses but who are otherwise competent under the standards adopted in Panetti, Ford, and Van Tran. "A competency proceeding is sui generis; it is not a trial." Coe, 17 S.W.3d at 214. The "only issue in a competency proceeding is the prisoner's mental state." Id. at 215. The Court in Coe "emphasize[d] that the only relevant constitutional concern at a competency-to-be-executed hearing is the right to have the substantive Eighth Amendment claim determined in a manner that comports with procedural due process." Id. at 211.

Notwithstanding the issues of timeliness and procedural propriety, we note that, while Mr. Irick has cited dissenting and concurring opinions in support of his argument, he has not cited, and research has not revealed, any majority court decision adopting a per se ban on the execution of severely mentally ill prisoners who are nonetheless competent to be executed. Furthermore, Connecticut appears to be the only state that has adopted a statute barring the execution of offenders who, at the time of the offense, had a "significantly impaired . . . ability to conform [their] conduct to the requirements of law." Conn. Gen. Stat. Ann. 53a-46a(h).[11] One commentator who advocates for a rule barring the execution of the mentally ill has stated that "the categorical approach invoked by the Court in both Atkins and Roper would not be appropriate in the context of severe mental illness. Because mental

---

[11] A bill exempting defendants who were identified as having serious mental illness from the death penalty was introduced in the Indiana legislature in 2009 but was not enacted. See S.B. 22, 2009 Gen. Assemb., Reg. Sess. (Ind. 2009).

illness varies considerably in its effects on those who experience it, a categorical exemption is not warranted."[12]

### IV. Conclusion

Having reviewed de novo the trial court's legal conclusions, we hold that the trial court applied the correct legal standards in determining the appellant's competence for execution. Additionally, after carefully and thoroughly reviewing the record on appeal, we conclude that the evidence fully supports and does not preponderate against the trial court's factual finding that the appellant is presently competent to be executed. Accordingly, the judgment of the trial court is affirmed.

This opinion is not subject to rehearing under Tennessee Rule of Appellate Procedure 39, and the Clerk is directed to certify this opinion as final and immediately issue the mandate. As provided by this Court's order of July 19, 2010, the Warden of the Riverbend Maximum Security Institution, or his designee, shall execute the sentence of death as provided by law at 10:00 p.m. on the 7th day of December, 2010, or as soon as possible thereafter within the following twenty-four hours, unless otherwise ordered by this Court or other appropriate authority. Counsel for Mr. Irick shall provide a copy of any order staying execution of this order to the Office of the Clerk of the Appellate Court in Nashville. The Clerk shall expeditiously furnish a copy of any order of stay to the Warden of the Riverbend Maximum Security Institution.

_____
CORNELIA A. CLARK, CHIEF JUSTICE

---

[12] Bruce J. Winick, The Supreme Court's Evolving Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier, 50 B.C. L. Rev. 785, 789 n.36 (2009). Professor Winick also points out that the American Bar Association, the American Psychiatric Association, the American Psychological Association, the National Alliance for the Mentally Ill, and the National Mental Health Association have adopted policy statements recommending a non-categorical, case-by-case determination of whether the severity of a defendant's mental illness at the time of the crime should bar the prosecution from seeking the death penalty. Id. at 789-90. "These five professional organizations recommend that the states adopt legislation exempting offenders from the death penalty if at the time of the offense, their mental illness 'significantly impaired their capacity (1) to appreciate the nature, consequences, or wrongfulness of their conduct; (2) to exercise rational judgment in relation to the conduct; or (3) to conform their conduct to the requirements of law.'" Id. at 818 (quoting ABA Task Force on Mental Disability and the Death Penalty, Recommendation and Report on the Death Penalty and Persons with Mental Disabilities, 30 Mental & Physical Disability L. Rep. 668, 670 (2006)).