# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 17, 2013 Session

## STATE OF TENNESSEE v. DEON LAMONT CARTMELL

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1351     J. Randall Wyatt, Judge**

**No.  M2012-01925-CCA-R3-CD - Filed July 7, 2014**

The Defendant, Deon Lamont Cartmell, was convicted by a Davidson County Criminal Court jury of second degree murder, a Class A felony, and received an eighteen-year sentence. *See* T.C.A. § 39-13-210 (2010).  On appeal, the Defendant contends that the trial court erred (1) in admitting the victim's statements into evidence, (2) in admitting evidence that the victim's wedding ring was missing, (3) in admitting evidence that Megan Prisco had a flirtatious relationship with him before the victim's death, (4) in admitting evidence that he boasted about his treating his wife poorly to Metro Police Field Training Officer Mackovis Peebles, (5) in admitting evidence that he carelessly left weapons around his house and used profanity when Antoya Brandon confronted him about it, (6) in admitting evidence of his conversation with Metro Police Chaplain James Duke, (7) in admitting proof of his relationships with other women after the victim's death, (8) in allowing the State to question him about his contact with Paige Merriweather, (9) in allowing the State to question him about an incident three years before the victim's death when he confronted her about having sex with other men, (10) in ordering redaction of a portion of the defense expert's report, and (11) in enhancing his sentence.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Jim Todd and Katie Hagan, Nashville, Tennessee, for the Defendant, Deon Lamont Cartmell.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Tom Thurman, Deputy District Attorney General; and Amy H. Eisenback, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**

This case relates to the March 16, 2010 shooting death of Shari Monique Cartmell, the Defendant's wife, at the marital home. Nashville Fire Department firemen responded and found the victim lying on the couch unresponsive, not breathing, and without a pulse. She was transported to Vanderbilt Hospital.

Metro Police Crime Scene Investigator Felicia Evans performed a gunshot residue test on the Defendant. At the scene, Investigator Evans found blood transfer on the doorways throughout the house, a nine-millimeter pistol and a paper towel lying on an ottoman, and a cartridge casing beside the ottoman. She said the Defendant wore a dark-colored "hoodie" and jeans and had blood on his clothes, hands, and face.

Metro Police Officer Kenneth Wolfe photographed the crime scene. He identified photographs of blood on the outside door of the house, a large amount of blood on the sofa, blood on the wall to the right of the front door, blood on the inside of the front door and on the door handle, and bloody rags on the floor and on the ottoman. He also found a handgun with blood on it lying on the ottoman and a cartridge casing lying on the floor beside it. He found a trauma plate inside the house, which he said was part of a police-issued bulletproof vest. He said chicken was in the oven and in the sink defrosting. He said that a gun safe was in the master bedroom closet and that handguns, a rifle, and a police-issued shotgun were in the master bedroom.

When Metro Fire Department Captain Michael Sisk arrived at the scene, the Defendant told him that he was in the kitchen when he heard the gun discharge. When the Defendant went with Metro Police Chaplain James Duke to notify the victim's mother of the victim's death, the Defendant told Chaplain Duke that he and the victim were at the house, that they were handling guns, and that she wanted to "dry fire" the gun. The Defendant said that the victim was cooking dinner, that she put the gun down to check the oven, and that he reloaded the gun and went to the bedroom to put up another gun. He said he heard a shot when he was in the bedroom and found the victim lying on the floor when he returned. He told Chaplain Duke that he attempted CPR but was unable to save the victim.

Metro Police Detective Charles Robinson testified that although the call was for an accidental shooting, he questioned whether the shooting was accidental after observing the blood spatter and after hearing the Defendant's statement to the police. The Defendant first said the victim was in the kitchen when he reloaded the weapon but then said she was standing by the couch. The Defendant had blood on his jeans, hands, and face. He was wearing a gray hoodie jacket over a white shirt when the police arrived but was not wearing

the jacket at the time of the shooting. Detective Robinson saw blood on the right side of the white shirt, which concerned him because the Defendant stated that the victim was on his left when he bent to get the AR-15 and heard the gun go off. Detective Robinson requested a gunshot residue test be performed on the Defendant and asked him to go to the police station. The Defendant was cooperative, consented to a search of the house, allowed the police to take his clothes and test his hands for gunshot residue, and went to the police station voluntarily. The Defendant allowed Detective Robinson to look at the text messages stored in his cell phone, and Detective Robinson determined that some messages were from Paige Merriweather. The text messages were read to the jury with the date and time they were sent but were not transcribed for the record.

On the day after the shooting, Detective Robinson interviewed the Defendant and recorded his statement, which was played for the jury. When asked about the March 16, 2010 events, the Defendant first told the detective about the victim's discharging a gun accidentally a couple months before the shooting. He said that the victim was "messing around" with the gun, that a bullet was in the chamber, and that she fired it. He said the bullet went through the mattress, the footboard of the bed, and the wall and hit his "subwoofer system" before stopping. The Defendant described the day of the shooting and said that he was reaching for his AR-15 and that the victim was on his left when he heard a "bang" and felt the force of the shot. He said he called 9-1-1, pressed a rag on the wound, and began CPR.

In response to Detective Robinson's question about whether the Defendant and the victim were having marital problems, the Defendant stated, "No, man. It was great." When asked if they argued about bills or had any recent arguments, the Defendant stated, "Well, no, the only, the only problems we ever, would ever be financial. . . ." He described his relationship with the victim's family and said he had issues with her mother. He discussed his texting another woman named Paige the morning before the victim's death and said he met her when he responded to her call to the police after she witnessed a traffic accident. When asked again if there were problems in his marriage, the Defendant said, "No, the last, the last time we got into an argument . . . would have been the last time we turned the mortgage in. Once we turned the mortgage in . . . it went back to normal." He said, "But we, you know, were doing good. I mean . . . it was all happy, man. It was . . . kissing in the morning, hugs at night."

After reviewing bills and letters found in the Defendant's house, Detective Robinson discovered that the couple was in poor financial condition. The Defendant told the police that the argument between him and the victim that was recorded by the cameras at Skyline Medical Center on March 11, 2010, concerned money and mortgage payments. Detective Robinson reviewed the Defendant's cell phone records and interviewed Megan Prisco,

Cherelle Bradford, and Sabrina Silverman based on the high volume of telephone calls and text messages exchanged between them and the Defendant.

Skyline Medical Center surveillance camera recordings from March 16, 2010, last showed the victim at the nurses' station at 3:48 p.m. Cynthia D. Edge, the director of patient registration, saw the victim on March 16 around 4:00 p.m. in the main admission and registration area. The victim talked until 4:15 or 4:20 p.m. and went to Christine Rogers's office afterward. Ms. Rogers, the emergency room patient access supervisor, said the victim left her office at 4:32 p.m. and was going home to get ready to go out with her friend Stephanie. Steve Rogers, Ms. Rogers's husband, saw the victim outside his wife's office on March 16 at 4:30 p.m. Detective Robinson made eleven trips from Skyline Medical Center to the Defendant's house using three different routes, and the shortest trip was seven minutes.

Detective Robinson testified that the time taken to drive between Skyline Medical Center and the Defendant's house was important to show how long the victim was home. He said that the 9-1-1 call was received at 4:46 or 4:47 p.m. and that witness statements showed that the victim left the hospital around 4:30. He said that according to the Defendant's statement, he went "from being in the bedroom shooting a gun to showing [the victim] how to actually take it apart and reassemble a gun, cooking, watching a movie, which was *Training Day*." Detective Robinson said that he did not see how the Defendant and the victim could have accomplished everything the Defendant stated when the timeline showed that the victim was only home about ten minutes before the Defendant called 9-1-1.

Ms. Rogers testified that the victim called her one night in 2009 about 9:00 p.m. and asked for a ride from a night club because she was afraid to go home. She did not know why the victim was afraid. She said the victim told her that she and the Defendant were in their apartment playing with a gun and that the Defendant shot through a doorframe into another unit. She said the victim also told her that when she and the Defendant were arguing about her not feeding a pet snake, the Defendant discharged a gun through the bed and out the bathroom window. Ms. Rogers heard the victim tell her friends in the emergency room, though, that she discharged the gun, not the Defendant. Ms. Rogers told the police that she thought the Defendant and the victim were a loving couple, that she did not believe the victim was in danger, and that if the victim was in danger, the victim would have told her.

Metro Police Field Training Officer Mackovis Peebles worked with the Defendant at the end of February 2010. When Officer Peebles asked the Defendant if he was married, the Defendant said that he was but that if he wanted to "go out and see his ho's," he would tell his wife and play mind games with her. Officer Peebles told the Defendant that he should not do that to his wife because it might be construed as verbal abuse, but the Defendant

laughed and joked about it. Officer Peebles overheard a heated cell phone conversation between the Defendant and the victim about bills.

Megan Prisco met the Defendant at a gas station where she worked. They traded telephone numbers in January or February 2010 and exchanged sexual text messages, although both were married. The Defendant visited Ms. Prisco when she worked on the weekends. The Defendant told her that he was married to his high school sweetheart and that they had a house together. He told her the victim wanted everything "top of the line." Ms. Prisco, the Defendant, and the victim went to the same high school, and the Defendant told Ms. Prisco that he wished he would have met her first. Ms. Prisco ended the relationship on March 7, 2010, because the Defendant drove by her house in a police car after she asked him not to come to her house. She saw the Defendant once after ending the relationship when he came to the gas station with another officer on March 12, 13, or 14, 2010. She said he looked stressed and told her that he was having problems at home but that "things were going to be taken care of not to worry about it."

Stephanie Lindblom was friends with the victim, worked with her at Skyline Medical Center, and had known her about two years. She said that on the Thursday before the shooting, the Defendant and the victim argued at the discharge desk in the emergency room about a house payment and that the Defendant wanted money from the victim. She said the Defendant walked into the emergency room and stated that he wanted the "God d--- money" and was tired of playing the victim's "f------ games." She said the victim was embarrassed and fearful. Ms. Lindlom left to register patients during the argument and received an e-mail from the victim that said, "Don't leave me up here with this nut." After the incident, the victim told Ms. Lindblom that if the Defendant wanted a divorce, "[I]t was his."

Ms. Linblom noticed the victim's wedding ring was missing in the months before her death and said that the victim was horrified that she lost the ring because she loved it. Ms. Linblom heard the victim talk about accidentally discharging a weapon at her house but said she did not believe the victim because she would not "play around" with guns and would tell the Defendant to put them away.

Antoya Brandon, the victim's sister, testified that the victim and the Defendant were married for three years. She said the victim was familiar with weapons and had been to a shooting range before marrying the Defendant. She knew about the victim's money problems and said the victim was "always broke" and had to borrow money. She noticed the victim's wedding ring was missing in the months before her death. Ms. Brandon said that she visited the Defendant and the victim's house with her two-year-old daughter, that she told the victim to ask the Defendant to remove a gun that was on the ottoman, and that the Defendant responded, "This is my f------ house and everybody can get the f--- out."

-5-

Charlotte Barbour, the victim's mother, testified that the victim's wedding ring was missing in the months before her death. She said that around Christmas 2009, she spoke with the victim about having children and that the victim told her she could not have children with the Defendant because he told her that if she left him, he would kill her, the baby, and himself before he paid child support. Ms. Barbour asked the Defendant if he made the statement, and the Defendant walked away without responding. On the Thursday before the shooting, Ms. Barbour went to the victim's house, saw a hole in the bathroom wall, and asked what happened. The victim showed her a gunshot hole in her mattress. The victim said she did not shoot the gun but did not answer when Ms. Barbour asked if the Defendant shot it.

Ricky Iverson, a patient access manager at Skyline Medical Center, testified that the Defendant called him between 7:00 and 8:00 a.m. on March 17, 2010, and asked whom to contact about life insurance. He said the Defendant wanted to come to the hospital and speak to the victim's co-workers to tell them his side of the story because he claimed the victim's mother had made inaccurate statements. Corey Northern, a Metro Human Resources analyst, testified that the Defendant called him on March 17, 2010, at about 9:30 a.m. to ask about life insurance for the victim and that although the Defendant could have applied for insurance on his wife, he had not.

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Robert Miles, an expert in gunshot residue, testified that the paper towel found at the crime scene tested positive for a large amount of gunshot residue, which meant it was near a gun when the gun was fired or had come in contact with a recently fired gun. The front of the Defendant's white shirt tested positive for gunshot residue on the right and left sides. The Defendant's jeans tested positive for gunshot residue on the right front pocket. Agent Miles said that gunshot residue could be from shooting a gun or from transfer, that a paper towel used to clean a gun could contain gunshot residue, and that a person cleaning a weapon could have gunshot residue on his shirt and pants.

TBI Special Agent Forensic Scientist Laura Hodge, an expert in gunshot residue analysis, testified that the gunshot residue test performed on the Defendant was inconclusive. She said the victim's gunshot residue test results did not show elements indicative of gunshot residue.

TBI Special Agent Forensic Scientist Terri Arney, an expert in firearms identification, testified that testing could not conclusively determine whether the bullet received from the medical examiner was fired from the Glock handgun found at the crime scene but that the bullet was the same caliber and had the same features he expected to find on a bullet fired from a Glock handgun. He said the cartridge found in the living room was fired from the

Glock handgun. He said the bullet and shell casing were both from a nine-millimeter. He said that all the safety features were operating on the Glock handgun found at the scene, that the gun was designed not to fire if dropped or struck, and that the trigger had to be pulled fully to fire, which took six and seven-eighths pounds of pressure.

TBI Special Agent Charles Hardy, an expert in DNA analysis, testified that the swabs taken from the wall, door, hall, and floor indicated blood. The swabs taken from the inside of the gun barrel did not show blood, and although a limited amount of human DNA was found inside the barrel, he was unable to obtain a DNA profile from it. The blood on the wall, floor, front door, hall, paper towel, and the Defendant's shirt matched the victim's DNA.

Dr. John Davis, a forensic pathologist and medical examiner, listed the victim's cause of death as undetermined at the time of the autopsy because he wanted more information. He said the manner of death, whether accidental or homicide, was ultimately a jury question. The victim was twenty-four years old and had a gunshot wound to the right side of her face. The bullet went through the victim's right cheek into her skull and out the back, left side of her head. He said that if the shooter was taller than the victim, the shooter had to shoot from below the victim to create the angle of the wound. He said stippling was found on the victim's face, which helped determine how far the gun was from the skin when it was fired. He requested test patterns of stippling from the gun to determine the distance. He determined the gun was between six and nine inches from the victim's face when it was fired and said it was closer to nine inches.

Dr. Davis testified that it was unlikely the victim fired the gun based on the angle of the wound, the distance between the gun and her face, and the amount of pressure needed to fire the gun but that it was possible the gun was held differently. He said that if the victim held the gun by the slide as the Defendant suggested, her hands would have had lacerations, which were not found. Dr. Davis said that the victim could have moved from the doorway to the sofa after she was shot because she did not have a brain stem injury but that the movement may not have been intentional.

Greg Smith, an insurance agent, testified that the victim had a $23,000 life insurance policy through her employer, which would double to $46,000 if her death was accidental. The victim applied for the insurance, not the Defendant. The beneficiary was the Defendant, and he submitted an application to receive the payout in May 2010.

Metro Police Sergeant Pat Postiglione took the blood spatter evidence from the crime scene to Jerry Findley, an expert in Statesboro, Georgia. He took most of the victim's clothes, the Defendant's clothes and shoes, a pair of gloves, photographs, the 9-1-1 call

recording, the Defendant's interview recording, and the witnesses' statements. He did not tell Mr. Findley his theory.

Sergeant Postiglione walked with Christine Rogers from her office where the victim was seen at 4:30 p.m. on March 16, 2010, to the employee parking lot where the victim was parked. The walk took two minutes and forty seconds. He drove from Skyline Medical Center to the Defendant's house three times, and the drive took approximately 8 minutes. He said the total time it took the victim to walk to her car and drive home was ten minutes and forty seconds.

Sergeant Postiglione obtained the computer aided dispatch (CAD) system history from the Defendant's patrol car. The CAD history showed that the Defendant went to Megan Prisco's address fourteen times between February 14 and March 7, 2010. He said that the Defendant "self-initiated" eight of the fourteen calls and that four of the eight calls were out of his patrol zone.

Jerry Findley, an expert in bloodstain pattern analysis and crime scene reconstruction, testified that the gun had blood transfer stains and that the paper towel had impact stains and gunshot residue consistent with its being used to hold the gun when it was fired. He said the blood stains on the victim's arm indicated she was holding her arm up when she was shot. The victim's left hand had impact stains on the palm meaning her left hand had to be open and exposed to the source of the blood. He said that if the victim was holding out the gun, she would have had impact stains on the underside of her right arm, which she did not have. The Defendant had impact stains on his nose and around his mouth, which showed that he was facing the victim "direct on" at the time of the gunshot. The Defendant had backspatter on the right side of his shirt, which was blood moving toward the source of the force that caused the injury, the gun. He had "swipe stains" on the left side of his shirt that looked like finger marks. Impact stains appeared on the Defendant's left shoe, which showed the shoe was facing the wound as backspatter returned. The impact stains on the Defendant's face and shoes indicated he was facing the "source of entry" at about a forty-five-degree angle. No blood was found in the other rooms of the house, although the Defendant said he took the AR-15 to the bedroom after the shooting.

Mr. Findley saw no evidence that the Defendant performed CPR and no blood evidence to support the Defendant's reaching for the AR-15 when the victim was shot. Mr. Findley's findings did not support any of the Defendant's three stories that he was in the kitchen, in the bedroom, or sitting on the couch when the victim was shot. His findings showed that the victim did not fire the gun. He believed the victim was shot somewhere near the front door, grabbed her face, and moved or was moved to the sofa where she remained until emergency personnel arrived.

The Defendant testified that he and the victim met in high school and started flirting when they worked together at Chuck-E-Cheese. He said that in 2004, he graduated from high school and enlisted in the Marines. He deployed overseas in November 2005 for four months and returned to Nashville to visit family in the spring of 2006. When he was in Nashville, he saw the victim at a mall, and they exchanged numbers. They began talking and started a long-distance relationship when he returned to Camp Lejeune, North Carolina. They became engaged on February 14, 2007, and were married in August 2007. The victim did not move to North Carolina with the Defendant but lived with her mother in Nashville. The Defendant and the victim eventually rented an apartment in Nashville where the victim lived alone while the Defendant remained in North Carolina. The Defendant was honorably discharged from the military in May 2008 for a medical disability and was hired by the Metro Police Department in October or November 2008. He entered the police academy, which lasted around six months and ended in July 2009. The Defendant and the victim bought a house in the fall of 2009.

The Defendant testified that he kept "a lot of firearms" in the house, including personal weapons and three police-issued service weapons. He had a gun safe in the master bedroom closet and kept all his weapons secured if he was not home. He said he kept one gun out and around him and the victim if they were home. He said that he carried a gun everywhere, even when he was off duty, and that the victim knew he always carried a gun. He said the victim sometimes carried a gun but did not have a carry permit. He cleaned his guns frequently.

The Defendant testified that he met Megan Prisco when he was working as a police officer and admitted having a texting relationship with her. He admitted that the majority of their text messages were sexual in nature. He said that flirting was "very normal" for him but that exchanging numbers was not. He agreed that his cell phone records showed he sent text messages to, called, and flirted with women other than his wife. He said he met Paige Merriweather when he responded to a traffic accident. He said that they flirted at the scene, that she gave him her number, and that he told her he was married. He said he deleted the text messages from Ms. Prisco and Ms. Merriweather to prevent the victim's seeing them.

The Defendant admitted that he and the victim had money trouble, were late on their bills, and lived paycheck to paycheck sometimes. He said that he paid the "large" bills like the mortgage, car note, and car insurance and that the victim paid the "smaller" bills like the utilities, cable, and cell phone. They had separate checking accounts. He said that the utility bills were in his name because the victim did not have good credit and that they placed the accounts in his name to avoid paying a deposit.

The Defendant testified that in March 2010 when the victim was in Virginia, he received a $600 "light" bill because the victim had not paid it. He took $400 from the money he had saved for the mortgage and paid the bill to avoid having the electricity turned off. He told the victim that he wanted her to repay him because he needed the money to pay the mortgage. On March 11, 2010, the victim told the Defendant to come to Skyline Medical Center for lunch because she had received her paycheck and would write him a check for the amount she owed. The Defendant was scheduled to work at 2:00 p.m. that day and went to Skyline Medical Center around noon to obtain the money. The victim was busy, could not leave, and kept saying "hold on." The Defendant said the argument overheard by the victim's co-workers concerned the Defendant's having to wait, not money. The Defendant admitted saying to the victim, "I am tired of playing these f------ games." He stated that he felt bad about what he said after he left, spoke with the victim on the telephone, and apologized for his behavior at her work. He said the victim apologized for hiding the missed payments on the bill. The victim later wrote him a check for $400, and he paid the mortgage.

The Defendant testified that on the day of the shooting, he received a call from a motorcycle shop informing him that his motorcycle was repaired and ready to be picked up. The victim took him to the motorcycle shop on her way to Skyline Medical Center to complete paperwork for a new job in a different department. The Defendant drove the motorcycle home but did not remember what time he arrived. He said he began watching the movie *Training Day* and took a couple of guns from the safe, including his Glock 19, which was his favorite sidearm, his first handgun, and the gun he always kept with him. He said he had a "ballistics lab" in the spare bedroom of the house, which was a "trauma plate" taken from the inside of a bulletproof vest and set against a hard surface like old rims or tires. He said he would fire rounds into it from about one foot away. The Defendant, the victim, and other visitors fired guns in the house multiple times.

The Defendant said that in his opinion, there were two ways to clean guns, "cleaning the gun" and keeping the gun "inspection ready" as a Marine would. "Inspection ready" meant being able to place a finger inside the gun barrel and remove it with no sign of "carbon buildup" or gunshot residue. He said he used Windex to clean the inside of the gun barrel to make it inspection ready.

The Defendant testified that he cleaned his guns that day. He said that when the victim arrived home that afternoon, he was removing a bullet lodged in the trauma plate. The Defendant would not allow the victim to shoot the gun when she asked because she had accidentally discharged a gun in January or February and guns were "kind of off limits." Regarding the accidental discharge, the Defendant said the victim told him in early 2010 that she accidentally shot a gun and that the bullet lodged in the wall. He said that the incident became a "big joke" but that he stopped leaving out guns for the victim because the accident

scared him. The Defendant said, though, that the victim could obtain a gun from the safe and that he could not prevent her from having one.

The Defendant said that after he told the victim that she could not shoot the gun, she stated she wanted the Defendant to teach her more about guns and that they began disassembling the Glock handgun in the living room. He said he could disassemble the gun in less than five seconds. He said the AR-15 was on the ottoman in front of him and the victim. He said the victim asked if he would like "Shake and Bake" chicken for dinner and went to the kitchen to begin cooking. He said that the victim cooked and that he rarely did. He said he sat in the living room watching the movie. He said that the events after the victim began cooking were "not really clear" and that he knew the victim had placed the chicken in the oven but did not know how long it had been cooking. He said he thought they were done with the guns, reloaded the Glock, and placed it on the ottoman in front of him. He did not know if the victim saw him reload the Glock.

The Defendant testified that when the victim returned to the living room, he told her he would show her how to disassemble the AR-15. He said he reached for the AR-15, heard a shot, and felt the force of the shot. He said the victim was on his left but did not know if she was sitting or standing. When he looked around, the victim was on her side, and he knew she was hurt. He said he called 9-1-1 and performed CPR without moving the victim from the couch. He said that the victim told him to get rags and that he ran to the linen closet. He said that his house alarm sounded when he was on the telephone and that he ran to the alarm keypad and pushed the medical button. He said that when he attempted CPR, air would not go into the victim's body and that he removed a tooth from her mouth and continued CPR. He said that he tried to find his police-issued CPR kit to obtain a better seal during CPR, could not find it, and threw the AR-15 in the gun safe where he kept his police gear.

The Defendant was unable to state exactly what happened in the minutes after the shooting and did not remember what he said to the officers when they arrived at the scene. He said he did not request the Fraternal Order of Police (FOP) attorney who came to the scene and did not remember what he and Chaplain Duke discussed. He signed a consent to search form, allowed the police to take a photograph of him, gave the police his clothes, and went to the police station voluntarily. He said the FOP attorney advised him to not make a statement that night.

The Defendant testified that he did not know if the victim had life insurance. He said he called the victim's employer and the police department's human resources to ask if there was life insurance for the victim because he had to plan her funeral and had no money to pay for it. He went to the police station the day after the shooting to tell the police what happened. He denied shooting his wife.

-11-

On cross-examination, the Defendant testified that he and the victim went to a gun range at least three times, talked about gun safety each time, and reviewed gun safety again after the victim's accidental discharge. He said he used the Glock on March 16 to teach the victim more about guns. He said that he was happily married but that he and his wife had problems. He denied saying he would kill the victim and their future child if he had to pay child support. He denied firing a gun at the victim in the house. He said he had asked the victim for a divorce and had called her a "fat b----" because he was an "a--hole."

The Defendant admitted that he made crude sexual comments to other women while he was with his wife and that he went to the jewelry store where the victim previously worked and asked her if she was "f------" two customers who were in the store. The Defendant admitted sending several text messages to Megan Prisco and driving by her house but denied stalking her. He admitted texting Paige Merriweather the night before the victim died. He said that Cherelle Bradford was a friend and agreed that they had sent 408 text messages to each other in three months, that he went to her apartment and stayed late at night, and that she wrote him letters when he was briefly incarcerated.

Metro Police Sergeant Bob Allen taught firearms and defensive tactics at the Metro Police Academy and was familiar with the Glock .40 caliber, a Metro Police standard firearm. He said the .40 caliber Glock was similar to the nine-millimeter Glock. He agreed the nine-millimeter handgun was an "extremely safe" weapon with two internal and one external safeties and said it would not fire if it was dropped or slapped because it had a drop safety and required proper pressure on the trigger to fire. He said that a finger or a hand would be cut if it was on the slide when the gun discharged. He said that a gun could be held several ways to fire and that it was possible to fire a gun without a hand on the slide when it recoiled. He said that if the gun were not held correctly when fired, the shell would not eject properly and that it would not fire again. He said more women than men had trouble gripping the firearm properly.

Michael Maloney, an expert in bloodstain pattern analysis and forensic crime scene reconstruction, testified that he did not believe the blood on the wall by or on the door was from the victim grabbing her face after she was shot and slinging her hand down because the direction of the blood was horizontal, not vertical. He did not believe the blood stains on the floor represented a trail. He said that the Defendant's shirt was within three feet of the shot, probably closer, and that the backspatter came from the left. He was uncomfortable addressing the blood on victim's hands and arms because did not know if it came from the gunshot or was transferred during life-saving measures. He did not think the victim grabbed her wound to block the flow of blood because the palm of her hand was not coated in blood as he would have expected and because blood dripping or flow patterns to the lowest point of her elbow were not seen. He said the blood spatter on both sides of the victim's hands was

not consistent with a defensive posture. He said the victim could not have walked through her own blood and made the shoe print that was found at the scene because she was not wearing shoes. In his opinion, the victim was seated to the Defendant's left on the sectional sofa on the second of three cushions, the Defendant was seated directly to the victim's right leaning forward and reaching toward the ottoman, and the gun was between three and nine inches from the victim's right cheek when it was discharged. He could not determine who controlled the weapon.

Mr. Maloney's findings did not show that the victim was laid on the floor for CPR. He said he would have expected blood on the AR-15 if the Defendant moved it to the closet after the shooting. He considered blood stains on the Defendant suspect because he pulled a hoodie over his face and wiped his hands between the shooting and the photographs but said the blood around the Defendant's mouth and on the tip of his nose was not inconsistent with CPR efforts. He said the evidence did not show that the Defendant was in the kitchen or the bedroom when the shooting occurred.

LeAnne Schaffer, a friend of the Defendant and the victim, testified for the defense that the Defendant, the victim, and other friends talked about the victim's accidentally discharging a gun. She said the victim stated that she fired the gun.

Rachel Walker, a friend of the Defendant and the victim, testified that in December 2009, the victim said that she picked up a gun and that it fired, went through her bed, and came out in the living room behind the television. She knew the victim lost her wedding ring because she helped look for it in the house and the yard. She said that she and the victim thought the dog got it.

The jury convicted the Defendant of second degree murder, and he received an eighteen-year sentence. This appeal followed.

**I**

The Defendant contends that the trial court erred in allowing testimony from Christine Rogers, Charlotte Barbour, and Stephanie Lindblom regarding the victim's statements. He argues that the victim's statements were inadmissible hearsay but that in any event, they were irrelevant and inadmissible. The State concedes in its brief that the trial court erred in admitting the victim's statements through the witnesses' testimony but argues that the error was harmless because the remaining evidence strongly supports the Defendant's guilt. However, the State argued during oral argument that the trial court did not err in admitting the testimony because the victim's statements reflected her state of mind, which rebutted the Defendant's claims of a perfect marriage.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless admission is authorized by the evidence rules or by other controlling provisions of law. *Id.* at 802. One exception to the hearsay rule is for a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . ." *Id.* at 803(3). The Advisory Commission Comment to the exception states that "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." The trial court's determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule will not be reversed absent an abuse of discretion. *State v. Trusty*, 326 S.W.3d 582, 602 (Tenn. Crim. App. 2010).

Even if a statement qualifies as a hearsay exception, it must be relevant to be admissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at 403. Our supreme court has defined unfair prejudice as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Mitchell*, 343 S.W.3d 381, 389 (Tenn. 2011) (quoting *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978)). "Rule 403 decisions fall within the discretionary authority of the trial court and will not be overturned absent an abuse of discretion." *Id.*

## A.

The Defendant contends that Ms. Rogers's testimony concerning a telephone call she received from the victim was inadmissible hearsay or, in the alternative, was not relevant. Ms. Rogers testified that one night in the fall of 2009 at about 9:00 p.m., the victim called and asked her to pick her up from a night club and that she agreed. She said the victim told her she was afraid to go home. She said that she heard a lot of noise in the background and that the victim told her she would call her back but never did. During cross-examination, Ms. Rogers admitted that the victim did not state why she was afraid to go home and said that it was possible she was afraid because the Defendant worked the night shift and she did not want to be home alone. The State argued in its response to the Defendant's pretrial motion that the victim's "fear and state of mind about her marriage [were] relevant to rebut the defendant's statement about their marriage and also to rebut that her death was an accident."

In a jury-out hearing, the trial court found that Ms. Rogers's testimony was "relevant to the relationship just before the death" and was admissible. The court did not state upon which hearsay exception it relied but noted that the victim's statements were relevant to

understand the Defendant and the victim's relationship before her death. The State argued in its response to the Defendant's pretrial motion that the state of mind exception to the hearsay rule was applicable.

A victim's statement is inadmissible under Rule 803(3) to show a defendant's conduct, but the State relies on *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993), and argues that the victim's statements were admissible to rebut the Defendant's claims of a happy marriage. In *Smith*, the defendant killed his estranged wife and her two sons from a previous marriage. During the defendant's statements to the police, he mentioned that he and his wife were reconciling. Our supreme court concluded that the testimony regarding the victim's previous statements showing her fear of the defendant were "relevant to reveal the falsehood in [the defendant's] statement." *Smith*, 868 S.W.2d at 573.

The victim never told Ms. Rogers why she was afraid to go home, and no evidence suggested that she was afraid to go home because she was afraid of the Defendant. Ms. Rogers admitted that it was possible the victim was afraid to go home because the Defendant worked the night shift and she did not want to be home alone. The victim's statement did not rebut the Defendant's claim of a happy marriage or show her state of mind concerning the marriage. It was not relevant and was inadmissible. Having determined that the trial court erred in admitting the statement, we must now determine whether the "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." *See* T.R.A.P. 36(b).

The testimony concerning the telephone call in which the victim told Ms. Rogers that she was afraid to go home from the night club was brief and straightforward. The Defendant cross-examined Ms. Rogers, and she admitted the victim did not tell her why she was afraid to go home. The evidence of guilt included the Defendant's own statements, which contradicted each other and which were all contradicted by expert testimony and blood evidence at the scene. Although the Defendant argued the victim was shot when she accidentally discharged the gun, the victim's hands tested negative for gunshot residue, and the State's expert testified that the blood evidence on the victim's arms and hands did not show she fired the shot. The Defendant was the only person with the victim when she was shot. The Defendant admitted that although he was happily married, they had problems. The victim's mother, sister, and co-workers discussed the Defendant and the victim's relationship, their recent argument at Skyline Medical Center, and their financial problems. When viewed in light of the other evidence against the Defendant, we conclude that the admission of this evidence was harmless error.

-15-

**B.**

The Defendant contends that Ms. Barbour's testimony concerning the victim's statements was inadmissible. At the trial, Ms. Barbour testified that she asked the victim when she would have children and that the victim told her she could not have children with the Defendant because he said that if the victim left him, he would kill her, the baby, and himself before he paid child support.

The Defendant sought to prevent Ms. Barbour from testifying about the victim's statement that the Defendant told her that "if he had to kill he would then kill himself." The State responded that the evidence was not offered for the truth of the matter asserted, was non-hearsay, and was relevant to rebut the Defendant's statement regarding the status of his marriage. The State also noted that it did not intend to introduce the quoted statement listed in the Defendant's motion but would introduce a similar statement and requested a ruling from the trial court.

In a pretrial hearing, the trial court heard Ms. Barbour's proffered testimony, which was similar to her trial testimony. The State argued at the hearing that the victim's statement was admissible as an exception to hearsay under Rule 803(3) because it showed the victim's and the Defendant's states of mind. In a separate hearing, the court found that the statement concerning the victim's not having children with the Defendant occurred four to six months before the shooting, that "it would be more likely to prejudice whatever probative value it may have," and that it was inadmissible. After the court's oral ruling, the State asked for clarification, and the court instructed counsel not to mention the incident during opening statements and stated it would reconsider the issue when it arose at the trial.

The State argued during a jury-out hearing on the motion that the statement rebutted the Defendant's statement to the police about the positive state of his marriage and that it did not believe a happily married man would tell his wife he would kill her and their child rather than pay her money. The State attempted to use the victim's statements to prove her and the Defendant's states of mind and to rebut the Defendant's statements about their marriage.

At the trial, the court stated that it "rethought and restudied" the motion concerning Ms. Barbour's testimony. The court found that in light of the evidence heard, Ms. Barbour's testimony about the victim's statement was admissible under Rule 803(3), the hearsay exception concerning the declarant's state of mind. The court found that the evidence showed the relationship between the Defendant and the victim and rebutted the Defendant's statements regarding the positive state of his marriage. The court found that the probative value of the evidence was not outweighed by the prejudice.

-16-

Testimony concerning a victim's statement of fear of a defendant is hearsay, but it is admissible under the state of mind hearsay exception. *Smith*, 868 S.W.2d at 573; *see also State v. Cravens*, 764 S.W.2d 754, 755 (Tenn. 1989) (concluding the victim's statement, "Well, I'm a dead man then," was admissible to show his state of mind shortly prior to his death). However, hearsay exceptions must be viewed in conjunction with principles of relevancy, and the issue is whether or not the victim's fear was relevant. Tenn. R. Evid. 803(3) Advisory Comm'n Cmt. ("Combining the hearsay exception with relevancy principles, declarations of mental state will be admissible to prove mental state at issue or subsequent conduct consistent with that mental state."). In *Smith,* the court stated, "While the evidence [of the victim's fear] was admissible to show the declarant's state of mind, . . . [the victim's] state of mind was not directly probative on the issue of whether the Defendant had murdered her and her sons." *Smith,* 868 S.W.2d at 573; *see also State v. Bragan*, No. 03CO1-9403-CR-00121 (Tenn. Crim. App. July 5, 1995) (holding that the victim's statement that he believed the defendant was going to kill him for insurance proceeds was not relevant on the issue of whether the defendant murdered the victim).

In allowing Ms. Barbour's testimony about the victim's statements under the state of mind hearsay exception, the trial court reasoned that the victim's state of mind was relevant to understand the Defendant and the victim's relationship before her death. The State concedes in its brief, though, that the statement concerning the victim's future children was not relevant because the victim did not have children and was not pregnant when she died. However, Ms. Barbour's testimony about the victim's statements showed the victim feared the Defendant, and the victim's state of mind was relevant to rebut the Defendant's statements to the police about the positive state of the marriage. *Smith*, 868 S.W.2d at 573. Although relevant, we conclude that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice and the needless presentation of cumulative evidence. *See* Tenn. R. Evid. 403.

Tennessee Rule of Evidence 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403. Our supreme court has stated that unfair prejudice is "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997) (quoting *State v. Banks*, 564 S.W.2d 947, 951 (Tenn.1978)). Prejudicial evidence is not excluded as a matter of law. *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000) (citing *State v. Gentry*, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)).

Evidence of the Defendant's relationships with other women, his statements to Officer Peebles about his treating his wife poorly and going out with his "ho's," the victim's statement that she would divorce the Defendant if he wanted, and testimony from the

victim's mother, sister, and co-workers rebutted the Defendant's statements about the positive state of his marriage. Ms. Barbour's testimony about the victim's statements was cumulative on the issue of rebuttal. Further, the danger of unfair prejudice was great because the statements concerned the Defendant's threatening to kill the victim, creating a risk that the statements would inflame the jury. We conclude that the evidence was cumulative, that probative value of the evidence was substantially outweighed by the danger of unfair prejudice, and that the trial court erred in admitting the statements.

Having concluded the trial court erred in admitting Ms. Barbour's testimony about the victim's statements referring to the Defendant's threat, we will consider whether it was harmless error, "error involving a substantial right more probably than not affected the judgments or would result in prejudice to the judicial process[.]" T.R.A.P. 36(b). As stated above, ample evidence was presented to rebut the Defendant's statements about the positive state of the marriage and to show his treatment of the victim. We conclude that the admission of this evidence was harmless error.

Regarding the trial court's admitting Ms. Barbour's testimony about the victim's statements concerning the bullet hole in the mattress, the Defendant argues that the court failed to follow the procedural guidelines in Tennessee Rule of Evidence 613 for admitting prior inconsistent statements. He argues that the court failed to give the jury instruction he requested limiting the admissibility of the prior inconsistent statement. He also argues that Ms. Barbour's testimony about the victim's refusing to answer when she asked if the Defendant made the bullet hole in the mattress was not a prior inconsistent statement and should not have been admitted. The State responds that the Defendant has waived the issue because he failed to raise it in his motion for a new trial. We conclude that because the Defendant failed to include it in his motion for a new trial, the issue is waived.

## C.

The Defendant contends that Ms. Lindblom's testimony concerning an e-mail she received from the victim and the victim's telling her the Defendant could have a divorce was inadmissible hearsay. Ms. Lindblom testified that she saw the victim and the Defendant argue at the discharge desk in the emergency room on the Thursday before the shooting. She said she left the desk to register patients during the argument and received an e-mail from the victim that said, "Don't leave me up here with this nut." She said that after the argument, the victim told her that she was embarrassed and that if the Defendant wanted a divorce, "it was his."

The Defendant sought to exclude Ms. Lindblom's testimony about the e-mail she received during the argument. At a pretrial hearing, the State argued that the e-mail was an

instruction or a request, that it showed the victim's fear of the Defendant because he verbally abused her in front of her co-workers, and that it rebutted the Defendant's statement about the positive state of their marriage. The court heard Ms. Lindblom's proffered testimony and found that her testimony was admissible, that the jury could determine the weight it deserved, and that it was "relevant to the relationship that was going on just before the death" of the victim.

Regarding the Defendant's argument about the e-mail, commands or instructions are not hearsay if they are not offered to prove the truth of the matter asserted. *See State v. Lequire*, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981); *State v. Charles O. Emesibe*, No. M2003-02983-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App. Mar. 28, 2005), *perm. app. denied* (Tenn. Oct. 17, 2005). The portion of the victim's e-mail instructing Ms. Lindblom not to leave her alone was not offered for its truth and was not hearsay. However, the victim's reference to the Defendant as a "nut" was not relevant and should have been redacted. In any event, when viewed in light of the other evidence against the Defendant, we conclude that the erroneous admission of portion of the victim's e-mail referring to the Defendant as a "nut" did not more probably than not affect the judgment and that the admission was harmless. *See* T.R.A.P. 36(b).

Regarding the Defendant's argument about the victim's agreeing to a divorce, the parties did not address the statement in the pretrial hearing on the Defendant's motion, and the trial court did not address the statement in its ruling. The victim's statement that she was agreeable to a divorce was admissible hearsay because it showed the victim's state of mind, which was relevant to rebut the Defendant's statements to the police about the positive state of the marriage. *Smith*, 868 S.W.2d at 573. The trial court did not err in admitting the statement. The Defendant is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erred in allowing testimony about the victim's missing wedding ring. He argues that Charlotte Barbour's testimony that the victim's stated, "Don't go there, just leave it alone," when she asked her about the missing ring was inadmissible hearsay. He argues that Antoya Brandon's, Stephanie Lindblom's, and Ms. Barbour's testimony about the victim's missing wedding ring was inadmissible because it was not relevant to whether the Defendant killed the victim and because any minimal probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. He argues that the State offered the evidence to show the jury that the victim was unhappy in her marriage and that the Defendant was complicit in the disappearance of her ring.

The State responds that the Defendant has waived the issue because he did not object to the testimony at the trial and did not pursue his motion addressing the testimony about the victim's wedding ring. In the alternative, the State argues that the evidence was properly admitted.

After reviewing Ms. Barbour's testimony, we note that she did not testify at the trial that the victim stated, "Don't go there, just leave it alone," when she asked her about the missing ring. She only testified that she noticed the ring was missing. The issue has no merit.

We conclude that the Defendant did not request and the trial court did not make a definitive ruling on whether the testimony about the missing wedding ring was admissible. The court stated, "That is fine," when the State agreed not to introduce the hearsay statements, but no ruling was ever made as to the other testimony. The Defendant has waived the issue.

### III

The Defendant contends that pursuant to Tennessee Rule of Evidence 404(b), the trial court erred in allowing Megan Prisco's testimony about her flirtatious relationship with the Defendant before the victim's death. He argues that because the relationship was "merely flirtatious" and he and Ms. Prisco never engaged in an extramarital affair, the probative value of Ms. Prisco's testimony was minimal and was outweighed by the danger of unfair prejudice. The State responds that the trial court properly found that the Defendant's relationship with Ms. Prisco and his comments to her revealed a possible motive, refuted his claims about the positive state of their marriage, and showed a possible intent to commit the offense.

Rule 404(b) prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). Evidence of other crimes, wrongs, or acts, though, may be admissible for other purposes, such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id.*; *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). The rule lists four requirements that must be satisfied before a court determines admissibility:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issues, the ruling, and the reasons for admitting the evidence;

-20-

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). We review a trial court's ruling on evidentiary matters under Rule 404(b) using an abuse of discretion standard, provided the court has substantially complied with the procedural prerequisites of the rule. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

The Defendant sought to prevent the State's witnesses from testifying about "an alleged flirtatious relationship" between the Defendant and Ms. Prisco. The State responded that Ms. Prisco's testimony was relevant because it concerned conversations she had with the Defendant shortly before the victim's death, would impeach the Defendant's statement to the police, would show the Defendant's state of mind shortly before the crime, and was proof of premeditation.

The trial court heard Ms. Prisco's testimony at a pretrial hearing. At the hearing, the Defendant argued that his relationship with Ms. Prisco was not relevant to whether he killed his wife. He argued that if it was relevant, its prejudicial value outweighed its relevance. The State argued that Ms. Prisco's testimony impeached the Defendant's statement about the positive state of his marriage and that his last conversation with Ms. Prisco showed his state of mind a few days before the victim's death.

In denying the Defendant's motion, the trial court found that the Defendant attempted to engage in an extramarital affair with Ms. Prisco and told her he wished he had met her before his wife. The court found that the relationship and his statements were evidence of a possible motive for murder and rebutted his statement to the police about the positive state of his marriage. The court also found that the Defendant's statement to Ms. Prisco a few days before the victim died that "everything was going to be ok because he was going to take care of it" was evidence of the Defendant's possible intent. The court determined that Ms. Prisco provided credible testimony and established the events between her and the Defendant by clear and convincing evidence. The court also found the probative value of the evidence was not outweighed by the danger of unfair prejudice.

No evidence suggests that the Defendant's relationship with Ms. Prisco was physical. However, the text messages between them were sexual in nature, and they were married to other people. We conclude that the evidence of the Defendant's extramarital sexual communication with Ms. Prisco before the victim's death was relevant to the Defendant and

the victim's relationship and probative of motive. The State introduced several witnesses who testified about the state of the Defendant and victim's marriage. Ms. Brandon testified that the victim and the Defendant had financial problems, and Detective Robinson found papers and bills in the marital home that showed the financial problems. Ms. Lindblom testified about an argument between the Defendant and the victim at Skyline Medical Center and about the victim's telling her the Defendant could have a divorce if he wanted one. The purpose of such evidence was to establish the Defendant's motive for killing the victim. Ms. Prisco's testimony about the sexual texting relationship she had with the Defendant before the victim's death was relevant to the Defendant and the victim's relationship and showed motive. In addition, the trial court found clear and convincing evidence that the Defendant committed the prior bad acts and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. We conclude that Ms. Prisco's testimony about her relationship with the Defendant before the victim's death was admissible.

**IV**

The Defendant contends that the trial court erred in allowing Officer Mackovis Peebles's testimony that the Defendant boasted about how poorly he treated his wife because it was inadmissible under Tennessee Rule of Evidence 404(b). He argues that his actions could be characterized as "merely immature behavior," that Officer Peebles never witnessed him abuse his wife or go out with other women, and that the court erred in finding he treated his wife the way Officer Peebles described. He also argues that the lack of evidence showing he behaved as Officer Peebles described shows that the probative value was not outweighed by the danger of unfair prejudice. The State responds that Officer Peebles's testimony about the Defendant's extramarital conduct was relevant to the state of the Defendant and the victim's relationship and was properly admitted as an admission by a party-opponent pursuant to Tennessee Rule of Evidence 803(1.2). The State does not address the Defendant's Rule 404(b) argument. We conclude the evidence was admissible.

The Defendant sought to prevent Officer Peebles from testifying about conversations he had with the Defendant in which the Defendant boasted about how poorly he treated the victim and about his overhearing the Defendant's yelling at the victim on the telephone. In its response to the motion, the State argued that the conversations were admissible to rebut the Defendant's statement about his marriage and to show his abuse of the victim before her death.

During a hearing, Officer Peebles testified that he worked with the Defendant from January to March 2010. He said that in February 2010, he and the Defendant guarded cars in a parking lot during a community meeting and that he talked to the Defendant to get to know him. He asked the Defendant if he was married, and the Defendant told him that he

-22-

was married but that when he wanted to see his "ho's," he would play "mind games" with the victim. He said that he told the Defendant that was "not cool" and that the Defendant laughed and joked at the time. He told the Defendant that his actions might be construed as "domestic - as verbal abuse" and said they were laughing about it at the time because the Defendant seemed like a "nice kid." He said that he later responded to a call with the Defendant and overheard the Defendant have an "aggressive" telephone conversation with the victim about bills.

At the hearing, the Defendant argued that although the evidence showed the Defendant sent text messages to and flirted with other women, his statements did not show he had affairs with them. The State argued that two weeks before the victim's death, the Defendant discussed with Officer Peebles his marriage, his playing "mind games" with the victim, and his relationships with other women. The State argued that the Defendant's statements to Officer Peebles impeached his statements to the police about his marriage and supported a motive and possible premeditation. The trial court found that Officer Peebles's conversation with the Defendant was shortly before the victim's death and that his testimony concerned the Defendant's tone and aggressiveness with the victim. The court found that the testimony concerned the Defendant and the victim's relationship and was admissible.

Similar to the testimony about the Defendant's relationship with Ms. Prisco, his statements to Officer Peebles that although he was married, he played "mind games" with the victim and went to see his "ho's" were relevant to the Defendant and the victim's relationship and probative of motive. The "aggressive" telephone conversation Officer Peebles overheard between the Defendant and the victim was relevant to show that the couple's financial problems had caused arguments, which was also probative of motive. Further, as stated above, the State introduced several witnesses who testified about the state of the Defendant and the victim's marriage and their financial problems. The purpose of such evidence was to establish that the Defendant had a motive for killing the victim and that her death was not an accident. Officer Peebles's testimony about the Defendant's statements concerning how he treated his wife, his seeing other women, and his "aggressive" conversation with the victim about bills was relevant to show the Defendant and the victim's relationship and the Defendant's motive.

We determine that the Defendant's statements to Officer Peebles were only minimally prejudicial because other evidence suggested that the Defendant had extramarital relationships before the victim's death and that the couple had arguments about their financial problems. We conclude that Officer Peebles's testimony about the Defendant's statements was admissible.

Regarding the Defendant's argument that Officer Peebles's testimony that he felt the Defendant was "inflicting domestic verbal abuse" on the victim was inadmissible, Officer Peebles testified that he told the Defendant he should not treat his wife the way he described because it could be "misconstrued as domestic verbal abuse." The Defendant did not raise the issue in a pretrial motion, did not contemporaneously object to the testimony at the trial, and did not address the statement in his motion for a new trial. The issue is waived. T.R.A.P. 3(e), 36(a). The Defendant is not entitled to relief on the issue.

## V

The Defendant contends that the trial court erred in admitting Antoya Brandon's testimony that the Defendant carelessly left weapons around the house and used profanity when confronted about it. He argues the evidence was inadmissible pursuant to Tennessee Rules of Evidence 401 and 403 because the Defendant's statements were directed toward Ms. Brandon, not the victim, and because no evidence showed when the statements were made in relation to the victim's death. The Defendant argues that any minimal relevance of the evidence was substantially outweighed by the danger of unfair prejudice. The State contends that the trial court did not abuse its discretion in admitting the evidence. The State argues that the Defendant's keeping guns in the house was relevant to contradict his claim that the victim's shooting was an accident. The State also argues the evidence showed that the Defendant's profane statements about moving the guns was made approximately nine months before the victim's death and that the statements were directed toward everyone in the room, including the victim.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at 403. We review a trial court's decision to admit evidence as relevant under an abuse of discretion standard. *State v. Turner*, 352 S.W.3d 425, 428 (Tenn. 2011). A decision to admit evidence will be reversed "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and the admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (internal quotations omitted).

At the trial, Ms. Brandon testified that she visited the Defendant and the victim's house with her two-year-old daughter, that she told the victim to ask the Defendant to remove a gun that was on the ottoman, and that the Defendant responded, "This is my f------ house

and everybody can get the f--- out." She agreed he was speaking to her and the victim, who were the only adults in the house.

The Defendant sought to prevent Ms. Brandon from testifying about the Defendant's leaving a gun on the kitchen table when she and her young daughter visited the victim and about the Defendant's response when the victim asked him to put up the gun. The State argued in its response to the motion that the Defendant's statements were admissible as statements of a party-opponent pursuant to Rule 803(1.2) and that they were relevant to rebut his statements to the police about his happy marriage and to show how he treated the victim before her death. After hearing Ms. Brandon's proffered testimony about the incident, which was similar to her trial testimony, the trial court found that the evidence was admissible to contradict the "happy marital situation" and that the jury could determine the evidence's probative value.

Regarding the Defendant's argument that the statements were directed toward Ms. Brandon, not the victim, Ms. Brandon's testimony showed that the Defendant's statement addressed "everybody," which included the victim. Regarding the Defendant's argument that no evidence showed when the statements were made in relation to the victim's death, we note that Ms. Brandon testified that the incident with the gun occurred when she took her daughter to the Defendant and the victim's house. She later testified that the Defendant and the victim lived in an apartment until they bought the house in October or November 2009. The record shows that because the statements were made when Ms. Brandon was at the house, they must have occurred in the five to six months the couple lived in the house before the victim's death in March 2010.

We agree with the Defendant that Antoya Brandon's testimony that he carelessly left weapons around the home and used profanity when confronted about it was not relevant. The Defendant's leaving guns around the house and his defensive response about putting them away when a child was in the house had no tendency to make any fact more or less probable in the determination of whether the Defendant was guilty of first degree murder. We fail to see how the trial court found that the gun in the house or the Defendant's statements contradicted the "happy marital situation." We conclude that the trial court erred in admitting the evidence because it was not relevant.

We conclude, however, that the error was harmless. *See* T.R.A.P. 36(b). Ms. Brandon's testimony about the incident was limited. Officer Wolfe described the numerous guns found in the Defendant's house and the gun safe in the master bedroom. In his statement to the police, the Defendant said that he left out a gun for the victim when she was home alone, that he was "big on security," and that he and the victim both loved guns. When viewed in light of the other evidence, we conclude that Ms. Brandon's testimony about the

-25-

Defendant's leaving out guns and his response when asked to put them away did not more probably than not affect the judgment. *See* T.R.A.P. 36(b). The Defendant is not entitled to relief on this basis.

## VI

The Defendant contends that the trial court erred in allowing Metro Police Chaplain James Duke's testimony about his confidential conversation with the Defendant. He argues that his statements to Chaplain Duke were confidential, that he and the chaplain were the only two in the car when he made the statements, and that he knew the chaplain as both the police chaplain and as a chaplain before he became a police officer.

The State responds that the trial court did not abuse its discretion in admitting the Defendant's statements to Chaplain Duke about the victim's death. The State argues that the Defendant's statements were not made for the purpose of seeking pastoral counseling but were made when Chaplain Duke was attempting to notify the victim's family of her death. The State argues that the purpose for Chaplain Duke's involvement was to notify the family, not to provide spiritual counseling to the Defendant. The State argues that Chaplain Duke did not know the Defendant was a potential suspect, that he attempted to stop the Defendant from discussing the incident with him, that he did not think he was violating confidentiality as a chaplain or religious counselor when he told the police about the Defendant's statements, and that the Defendant did not make any incriminating statements to the chaplain.

Statements made to clergy members are generally considered privileged testimony under the clergy-penitent privilege, which provides that

> No minister of the gospel, priest of the Catholic Church, rector of the Episcopal Church, ordained rabbi, or regular minister of religion of any religious organization or denomination usually referred to as a church, over eighteen (18) years of age, shall be allowed or required in giving testimony as a witness in any litigation, to disclose any information communicated to that person in a confidential manner, properly entrusted to that person in that person's professional capacity, and necessary to enable that person to discharge the functions of such office according to the usual course of that person's practice or discipline, wherein such person so communicating such information about such person or another is seeking spiritual counsel and advice relative to and growing out of the information so imparted.

T.C.A. § 24-1-206(a)(1) (2000).

The Defendant sought to prevent the State's witnesses from referring to his statements to Chaplain Duke because they were privileged pursuant to Code section 24-1-206. The State responded that the Defendant did not attend church where the chaplain was the minister, did not disclose confidential information to the chaplain, did not communicate with the chaplain for spiritual counsel and advice, and intended for the information he gave the chaplain to be told to the victim's mother, which would have negated any privilege.

At a pretrial hearing, the Defendant testified that he knew Chaplain Duke before becoming a police officer because Chaplain Duke lived near his father's house and he went to school with Chaplain Duke's daughter. He knew that Chaplain Duke was a police officer and a pastor for a church but did not know which church and had not attended services there. He remembered seeing Chaplain Duke in the yard on the day of the shooting, sitting in the car with him, and praying a couple of times. He agreed he thought he was speaking to Chaplain Duke as the police chaplain when he told him what happened when they were in the car at the victim's mother's house before notifying her of the victim's death.

On cross-examination, the Defendant agreed that he wanted to go with Chaplain Duke to notify the victim's mother, that Chaplain Duke told him it was not a good idea, and that he insisted on going. He remembered riding in the car with Chaplain Duke but did not remember what he said or if Chaplain Duke told him not to say anything about the incident. He said he and Chaplain Duke prayed together at the scene and maybe again later but was not "really sure." When asked if he told Chaplain Duke what happened in order for Chaplain Duke to explain it to the victim's mother, he said he told Chaplain Duke what happened because Chaplain Duke was the chaplain and because he felt like he could talk to him. He denied confessing to Chaplain Duke.

Chaplain Duke testified that he had been a police officer for twenty-three years and had been the pastor of a church in the city for fourteen years. He said he did not "really know" the Defendant but had seen him as a teenager in the neighborhood. He said the Defendant did not attend his church and had not asked him for spiritual guidance. He said that a sergeant requested that he come to the scene of the shooting, that he knew a person was shot at an officer's house, and that he saw the Defendant when he arrived at the scene. He said that the police were going to place the Defendant in the back seat of a patrol car and that he pulled his car closer to the scene to allow the Defendant to sit in it instead. He said that a detective told him not to question the Defendant because of the investigation and that he honored the request. He said that if a prayer was made, it was made by the sergeant who was sitting with the Defendant when he arrived and who stood outside his car when the Defendant was inside. He denied that he saw the Defendant pray or that he prayed with the Defendant.

Chaplain Duke testified that the Defendant rode with other officers to the Criminal Justice Center and that he followed them there. He denied praying with the Defendant at the center. He said that he returned to the Defendant's house after the Defendant left the Criminal Justice Center to obtain the victim's mother's address. He said that the Defendant wanted to accompany him to make the notification but that he did not want the Defendant to go because the Defendant was distraught. He told the Defendant he did not want him to go, but the Defendant insisted.

Chaplain Duke testified that the Defendant rode with him to the victim's mother's house to make the notification. He said he told the Defendant that he would talk and make the notification and that the Defendant should just be there with him. He said that before they left the car, the Defendant asked if he needed to know what happened and that he told him he did not because he was only there to inform the mother of the victim's death, not to provide details. He said that he did not pray with the Defendant and that the Defendant did not seek his advice. He said the Defendant told him that he liked shooting guns and that he allowed the victim to shoot sometimes. He said that he told the Defendant he did not have to tell him what happened but that the Defendant continued. He said the Defendant told him that the victim had his gun out and was " dry firing," that she put down the gun and went to the kitchen to check the chicken, that when she was gone, he reloaded the weapon and returned it to the table, and that he went to a bedroom to put up another gun. The Defendant told him that when he was in the other room, he heard a shot, that when he returned, he saw the victim was shot, and that the victim did not know he reloaded the gun.

Chaplain Duke testified that the Defendant gave him the information after he told him he did not need to know. He said he thought the Defendant told him what happened in order for him to have answers for the victim's mother if she asked. He did not believe the Defendant sought religious counsel from him.

On cross-examination, Chaplain Duke testified that he taught classes at the police academy about domestic violence and how to conduct death notifications, that he told officers at the academy that his office was available, and that most officers who wanted to talk to him "from a spiritual standpoint" had experienced a traumatic situation or had family or personal issues. He agreed he went to the scene as a chaplain, not an investigating officer. He said that he offered condolences and allowed the Defendant to sit in his car. He said that he did not pray with the Defendant but that he heard the sergeant pray when the Defendant was in his car. He denied speaking with the Defendant at the Criminal Justice Center other than asking for the victim's mother's address. He said that after they returned to the Defendant's house, the Defendant told him the street name for the victim's mother's address but did not know the house number. He said he went to the victim's mother's house in his official capacity as police chaplain to make the death notification. He said he told the

Defendant he did not need to know what happened. He said that when the Defendant made the statements, he thought the Defendant was "trying to make peace, sense of what had happened."

The trial court found that the conversation between the Defendant and Chaplain Duke did not "really [ring] true as being a priest, penitent, clergy, parishioner . . . relationship type conversation." The court noted that Chaplain Duke told the Defendant he did not need to tell him what happened, that the chaplain was there only to notify the mother of the victim's death, and that the Defendant proceeded to tell him a version of the events. The court stated that the conversation seemed to be a way for the Defendant to "get his story out there to the mother to kind of half-way explain before the shock hit her to put his best foot forward about this incident was an accident of some sort." The court noted that Chaplain Duke did not pray with the Defendant, that the Defendant had not been to Chaplain Duke's church, and that the Defendant had never sought spiritual guidance from him.

In its written order, the trial court found that the Defendant did not communicate with Chaplain Duke in a confidential manner because the Defendant's motivation for his statements was not to admit wrongdoing but to provide Chaplain Duke with details of the incident for him to answer the victim's mother's questions about how the victim was killed. The court determined that the Defendant gave implicit permission to disseminate the information he told Chaplain Duke. The court also found that Chaplain Duke did not minister to or pray with the Defendant but only consoled him, that the Defendant did not request spiritual advice or counsel from Chaplain Duke, and that Chaplain Duke did not provide spiritual advice or counsel to the Defendant. The court determined that the Defendant's motivation for imparting the alleged privileged information was not to seek spiritual counsel but to provide details of the victim's death to allow Chaplain Duke to tell the victim's mother. The court concluded that the clergy-penitent privilege did not apply to Chaplain Duke's testimony. Chaplain Duke testified at the trial that the Defendant told him the same version of events that he described during the pretrial hearing.

The language of the statute provides that a clergy member is prohibited from testifying about information communicated when the penitent was "seeking spiritual counsel or advice" related to the information communicated. The trial court credited Chaplain Duke's testimony that the Defendant made the statement about what happened because he thought Chaplain Duke needed to know to be able to tell the victim's mother, that he did not pray with the Defendant, and that the Defendant did not seek religious counsel from him. The record reflects that the Defendant was not seeking spiritual counsel or advice when he made the statement and does not show that he intended for the communication to be confidential. The trial court did not err in admitting the evidence.

## VII

The Defendant contends that the trial court erred in allowing testimony regarding the Defendant's relationships with other women after the victim's death. He argues that his relationships and text messages with Cherelle Bradford and Sabrina Silverman occurred after the victim's death, that he was questioned on cross-examination about his relationship with Ms. Bradford, and that Detective Robinson testified about his text messages with both women. He argues that the relationships formed after the victim's death were not relevant pursuant to Tennessee Rules of Evidence 401, 403, and 404(b). He argues that consensual relationships formed after his wife's death were not bad acts under Rule 404(b) and that any relevance was outweighed by the danger of unfair prejudice under Rule 403.

The State responds that the trial court did not abuse its discretion by admitting evidence of the text messages. The State argues that the Defendant's romantic relationships in the weeks after the victim's death established that he was "quickly moving on from his marriage" and revealed a motive for killing the victim.

At the trial, Detective Robinson testified that he subpoenaed the Defendant's cell phone records from before and shortly after the victim's death. He said that after he reviewed the records, he interviewed Megan Prisco, Cherelle Bradford, and Sabrina Silverman based on the high volume of calls and text messages between the Defendant and the three women.

Defense counsel asked to approach the bench and asked the State whether the communication with Ms. Silverman occurred after the victim's death. The State admitted the Defendant's communication with Ms. Silverman occurred after the victim's death, and the Defendant objected based on relevancy to any testimony about the Defendant contacting other women after the victim's death. The prosecutor said that he asked the detective if the cell phone records were from before and after the victim's death, that the detective said they were both, and that he would not ask further questions about the communication after the victim's death unless the Defendant testified. The court stated that was "fine." Defense counsel said he wanted to ensure the State was not planning to ask further questions about the communication and was "good" with the State's explanation. The remainder of Detective Robinson's testimony about the text messages concerned the Defendant's communication with Ms. Prisco before the victim's death.

Regarding his communication with the women after the victim's death, the Defendant testified on direct examination that his cell phone records showed he had flirted with, called, and sent text messages to other women. On cross-examination, the Defendant testified that Ms. Bradford was a friend and agreed that they had sent 408 text messages to each other over

a three-month period, that he went to her apartment and stayed late at night, and that she wrote him letters when he was incarcerated.

Defense counsel objected and questioned whether the Defendant's contact with Ms. Bradford, which occurred months after the indictment, showed motive. The trial court stated that it did not think the parties needed to address the relationship further, that addressing it briefly was fine, and that the State could ask about Ms. Bradford's writing the Defendant a letter but that it did not want to hear more about the Defendant's being incarcerated. The court found that the prosecutor's questioning "ha[d] to do with the relationships and he can ask him that."

Upon further questioning during cross-examination, the Defendant testified that he had seen Ms. Silverman before the victim's death but did not know her. He agreed that beginning two weeks after the victim's death, he sent 269 text messages to Ms. Silverman in one month. He said he met her right after his wife died. He said she was a friend.

In *State v. Robinson*, 73 S.W.3d 136, 153 (Tenn. Crim. App. 2001), this court determined that evidence of a defendant's having a sexual encounter after a victim's death "may be relevant to infer the defendant's motive" but that the probative value of the evidence that the encounter occurred in the marital bed was outweighed by the danger of unfair prejudice. The court concluded that although the defendant's having sex with another woman one month after his wife's death may be slightly probative to infer the defendant's motive, allowing proof that the act occurred in the victim's bed risked "stirring emotions that could cause the jury to decide the case on an improper basis." *Id.*

Unlike *Robinson*, the location of the contact is not an issue in the present case, only the fact of the Defendant's relationships and his sending text messages to other women soon after his wife's death. Similar to Officer Peebles's testimony about the Defendant's seeing other women when he was married and Ms. Prisco's testimony about her relationship and sexual text messages with the Defendant before the victim's death, the Defendant's sending text messages to other women soon after the victim's death was relevant to show the Defendant's motive and to impeach his statements about his happy marriage. The Defendant is not entitled to relief.

**VIII**

The Defendant contends that the trial court erred in allowing the State to question the Defendant about his contact with Paige Merriweather. He argues that when Ms. Merriweather was questioned during a jury-out hearing to determine the admissibility of her testimony, she was hesitant to state that the text messages the Defendant sent her were overly

flirtatious. He argues that the questioning regarding his relationship with Ms. Merriweather "was in violation" of Tennessee Rule of Evidence 401, that the non-flirtatious text messages sent to another woman when he was married were not bad acts, and that if the messages were bad acts, they were inadmissible pursuant to Rule 404(b). The State responds that the evidence of the Defendant's contact with Ms. Merriweather was properly admitted to give context to the Defendant's discussing her in his statement to the police on the day after the victim's death.

At the trial, defense counsel asked the Defendant about Ms. Merriweather. The Defendant agreed that the State had introduced text messages from her found on his cell phone and that he told the police about her during his interview. The Defendant testified that Ms. Merriweather called the police after witnessing a traffic accident and that he responded. He said that they thought they recognized each other, that they began flirting, and that she gave him her telephone number. He said he told her he was married but agreed she told the police that he did not. He agreed he sent a text message to Ms. Merriweather around 10:00 p.m. on March 15 and thought the message said, "[H]ey chick, talk to you later. I'm heading home, something of that nature, and pretty much that was me saying, hey, I am going home. I am married, you know, don't text me." He agreed he deleted the text messages from his cell phone to prevent the victim's seeing them.

On cross-examination, the prosecutor asked the Defendant if he met Ms. Merriweather the week the victim died. The Defendant testified that he did not know if he had met her before that week but that he thought he recognized her at the traffic accident scene. He agreed he sent her a text message at 10:00 on the night before the victim died.

We note that the Defendant's brief does not challenge the admission of his text messages to Ms. Merriweather, which Detective Robinson found on the Defendant's cell phone and read to the jury. Instead, the Defendant contends that the trial court erred in allowing the State to question the Defendant about his contact with Ms. Merriweather.

Evidence that is not admissible based on lack of relevance may nevertheless be admitted if the defendant "opens the door" by putting it into controversy. Opening the door is "an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012).

The Defendant opened the door when he testified on direct examination concerning his contact with Ms. Merriweather. He admitted meeting her when he responded to a traffic accident, flirting with her, receiving her telephone number, and sending her a text message the night before the victim died. The State's cross-examination on the subject was brief in

-32-

comparison, consisting of only two questions. The State did not introduce new evidence but asked the Defendant about statements he made during direct examination. In any event, the defense did not object when the State questioned the Defendant about his contact with Ms. Merriweather. The failure to object contemporaneously constitutes a waiver of the issue. T.R.A.P. 36(a). The Defendant is not entitled to relief.

## IX

The Defendant contends that the trial court erred in allowing the State to question him about an incident that occurred three years before the victim's death when he confronted her about having sex with the men who were shopping in the jewelry store in which she worked. He argues the evidence was inadmissible pursuant to Tennessee Rules of Evidence 401, 403, and 404(b). He argues that any alleged conduct that occurred three years before the victim's death could not be relevant, that the accusations toward the victim did not rise to the level of bad acts, and that even if they were bad acts, they were only admitted to show action in conformity with his character. The State responds that the Defendant has waived the issue by failing to raise it in his motion for a new trial. In the alternative, the State contends that the evidence was properly admitted because it showed the Defendant's controlling behavior and the "double standard" that existed in the marriage because the Defendant admitted having multiple extramarital relationships. The State argues that the evidence was probative of the Defendant's abusive conduct toward the victim throughout their marriage.

At the trial on cross-examination, the prosecutor asked the Defendant if he remembered going to a jewelry store where the victim worked and asking if she was "f------" two customers who were in the store. The Defendant responded, "Ah, yes." When asked what the statement concerned, he said that people took seriously a lot of the comments he and the victim made when they were not serious. He did not remember talking to the two customers in the jewelry store but remembered making the comment as a joke to the victim.

The Defendant sought to prevent the State's witnesses, specifically Megan Evans, from referring to the Defendant's comments in the jewelry store. He argued the motion during a pretrial hearing, contending that the evidence was not admissible pursuant to Rules 404 and 403(b). The State argued that the evidence showed the state of the Defendant and the victim's relationship, impeached the Defendant's statement about his happy marriage, and showed the Defendant's verbal abuse of the victim. The trial court stated that it was not inclined to permit the evidence but that it was willing to hear from Megan Evans before making its final ruling. Ms. Evans later testified in a jury-out hearing, but she was not asked about and did not address the jewelry store incident. The Defendant did not present further argument or evidence on the issue and did not request a final ruling. Ms. Evans did not testify at the trial.

Even if a defendant did not object contemporaneously to the admission of evidence at trial, the issue is not waived if the trial court was apprised pretrial of the defendant's objection and made definitive rulings at that time based upon the objection. *See Goines v. State*, 572 S.W.2d 644, 649 (Tenn. 1978). However, we conclude that the Defendant did not request and the trial court did not make a definitive ruling on whether the testimony about the jewelry store incident was admissible. The court stated it was willing to hear from Megan Evans before making its "final ruling," and no final ruling was ever made. Further, the Defendant failed to object to the questioning at the trial and did not argue the issue in his motion for a new trial. *See* T.R.A.P. 36(b). The Defendant has waived the issue.

**X**

The Defendant contends that the trial court erred in ordering the Defendant to redact any reference in his expert's report to it being peer reviewed. The Defendant argues that the two blood spatter experts who testified at the trial reached different conclusions and that the fact his expert's report was subjected to peer review and the State's expert's report was not was an issue the jury should have considered in determining the reliability and trustworthiness of each expert.

The State responds that the trial court did not abuse its discretion by redacting the peer review portion of the Defendant's expert's report. The State argues that this court is precluded from reviewing the issue because the redacted portion of the report is not included in the record. In the alternative, the State argues that the peer review of the report would have inappropriately bolstered the Defendant's expert's credibility and that if the report included statements from the expert's colleagues, the statements would have been inadmissible hearsay.

At a pretrial hearing, Mr. Maloney testified that his company did not send final reports without their being peer reviewed. He said the end of his final report would state it was peer reviewed and name the expert who reviewed it. The prosecutor stated that he would object to the peer-review section of the report unless the State could cross-examine the expert who reviewed the report. The Defendant argued that the peer-review section supported the credibility of Mr. Maloney's report. The trial court took the matter under advisement and issued an order, finding that any language in Mr. Maloney's report regarding its being peer reviewed must be redacted to conform with the prohibitions against hearsay. At a later pretrial hearing after the final report was completed, defense counsel told the court that Mr. Maloney's final report included a section noting it was peer reviewed and that the section would be removed.

The Defendant argues that peer review is included in the list of factors used to determine the reliability of expert testimony found in *Coe v. State*, 17 S.W.3d 193, 226 (Tenn. 2000), *abrogated on other grounds by State v. Irick*, 320 S.W.3d 284 (Tenn. 2010). Our supreme court stated in *Coe* that a

> . . . Tennessee trial court may consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye,* the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Id.* The list of factors is "non-exclusive." *Id.* A trial court's decision regarding the admission of expert testimony on scientific evidence will not be disturbed absent an abuse of discretion. *State v. Begley*, 956 S.W.3d 471, 475 (Tenn. 1997).

We note that the trial court, not the trier of fact, determines the reliability of an expert and "need not weigh or choose between two legitimate but conflicting scientific views." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). The trier of fact determines the weight given to scientific theories and the resolution of competing scientific views. *Id.* The list of factors in *Coe* are to assist the trial court, not the jury, in determining the reliability of an expert's testimony for admissibility purposes. The jury was not responsible for determining the expert's reliability but for resolving the experts' competing resolutions and for determining the weight to give the experts' testimony.

Regarding the Defendant's argument that the trial court erred in redacting the peer review section from the final report, the record indicates that Mr. Maloney's final report underwent peer review to validate the report, not to validate the "'relevant scientific methods, processes, and data'" behind the report as contemplated by the factor in *Coe*, 17 S.W.3d at 226 (quoting *McDaniel*, 955 S.W.2d at 265). Mr. Maloney testified that the end of his final report would state that the *report* was peer reviewed, not the scientific evidence used. The Defendant argued that the peer-review section supported the credibility of Mr. Maloney's *report*, not the reliability of the scientific methodology used to create the report. Because the peer review section contained an out-of-court statement that it was peer reviewed by a separate named expert and because the statement was offered to prove that Mr. Maloney's report was valid and more credible because it was reviewed by a separate expert who was not at the trial, the trial court did not err in finding the section contained hearsay. *See* Tenn. R. Evid. 801(c). The Defendant cross-examined the State's expert and presented his own expert's testimony and full report, giving the jury the opportunity to accept or reject either

-35-

expert's findings. The trial court did not abuse its discretion in redacting Mr. Maloney's report.

## XI

The Defendant contends that the trial court erred in enhancing his sentence to eighteen years, which was above the mandatory minimum fifteen-year sentence for his conviction, based on his previous criminal behavior. He argues that the court did not establish on the record which criminal acts it found by a preponderance of the evidence that the Defendant committed. The State responds that the trial court did not abuse its discretion in sentencing the Defendant. We agree with the State.

At the sentencing hearing, Muriel Lynn Cole testified that the victim was his niece and that he knew the Defendant. He said he borrowed $20 from the victim at Thanksgiving in 2009 but did not know if she told the Defendant about the money. He said that he was lying on his mother's bed at her house in a retirement community in Madison, Tennessee, when the Defendant came into the room, pulled out a pistol, and asked where was the victim's $20. He said the victim must have told the Defendant about his borrowing the money but not about his repaying her. He said that the incident upset him but that he did not report it to the "authorities" because the Defendant was trying to become a police officer, which he knew would not happen if the incident were reported. He said the Defendant pointed the gun at his stomach when he was lying across the bed. He said that he was "perplexed" by the Defendant's actions, that he did not know why the Defendant pulled out the gun, and that they never really talked after the incident. He said he reported the incident to the police after the victim's death. Upon questioning by the trial court, Mr. Cole testified that he was visiting his mother at the retirement center and that she was in another room with other guests at the time of the incident.

On cross-examination, Mr. Cole testified that the gun was near his stomach and that the Defendant was close enough to know the gun was pointed at his lower abdomen. He said that he did not respond to the Defendant's question about the victim's $20 and that he looked at the Defendant like he was a "complete idiot." He denied the Defendant searched his pockets and said the Defendant stood for "a second," placed the gun inside his waist band, and returned to the living room. He said he waited until the Defendant left and told his mother and a few other family members what happened.

Mr. Cole testified that he was "pretty sure" the victim's family had written letters in support of the Defendant's applying to be a police officer, but he had not read them. He did not think he told his family not to write letters in support of the Defendant and said he left it to their discretion. He denied he thought the Defendant tried to rob him and said the

Defendant was trying to have the victim's money returned. He said that the Defendant used a gun, that the gun was a nine millimeter, and that he was familiar with nine-millimeter handguns because he watched television and had seen them in books.

Mr. Cole testified that he did not call the police because he thought it would cause problems, he loved the victim, and he thought the victim would not be happy with him. He said that he discussed the incident with the victim, that he told her he did not like the Defendant and did not want anything to do with him, and that he was invited to their housewarming but did not go. He said he did not report the incident to law enforcement until after the victim's death because he loved the victim and did not want to see her hurt. He said that he thought the Defendant was crazy when he pulled out the gun but that he could not control the victim's living with him and that if she was happy, he had to live with their relationship. He said that he did not approve of the Defendant's being a police officer but that it was not his place to decide if he could be an officer.

Charlotte Barbour testified that she was the victim's mother and read a letter she had written about how the victim's death affected her life. She said that she had not slept since March 16, 2010, that the victim was her baby, and that she missed her, her laughter, her hugs, her kisses, her voice, and their outings. She said the victim's death left a "big hole" in her heart that would not close. She said the victim was known as sweet and precious. She said that words could not explain the loss, that it was "past the nightmare," and that she wished she could awake. She said that she no longer had to worry about the victim being hurt, hit, or verbally or mentally abused but that she missed her.

Antoya Brandon testified that she was the victim's sister. She said that a couple of months before the victim's death in the late fall or early winter of 2009, she and her husband met the victim and the Defendant at Las Palmas for dinner. She said that they all ordered drinks and that the Defendant had a bottle of wine. She said that the Defendant drank quickly and that the waiter came and took the bottle without the Defendant's realizing it. She said that when the Defendant noticed the bottle was gone, he asked where it went and that they told him he drank it all. He stated he did not, took out a gun, and set the gun on the table. She said that they all looked at him, that her husband and the victim told him to put away the gun, and that the Defendant just laughed before eventually putting away the gun.

Ms. Brandon testified that she prepared a statement for the trial court about how the victim's death affected her life. She said that the victim was her baby sister, that they were eighteen months apart, and that they did everything together. She said that the victim's death was the worst experience of her life and that the worst parts were seeing her mother hurt, knowing her youngest child would not know her aunt, and explaining to her oldest child why the victim was not there. She said that it was hard on her but that it bothered her more to see

how her cousins and her children were affected. She said she had no other siblings and would never have a niece or a nephew.

On cross-examination, Ms. Brandon denied that she thought the Defendant threatened her or her husband with the weapon at the restaurant. She said the incident at the restaurant occurred after she confronted the Defendant in August concerning incidents between him and the victim about which Megan Evans told her. She said she associated with the Defendant after the confrontation because he was her sister's husband and she did not have a choice. She said she did not feel the need to report the incident at the restaurant to the police.

Reba Cartmell Simmons, the Defendant's paternal aunt, testified on behalf of the Defendant that she, her mother, and her two sisters raised the Defendant and that the Defendant's mother did not "play a major role" in raising him. She said that the Defendant's mother was very young when she had him, that it was hard for her to care for him, and that he stayed with his great-grandmother. She said that when the Defendant was less than one year old, the family agreed the Defendant should be raised by his father's family. She said that her mother kept the Defendant during the day when his father worked and that he was a happy and helpful child. She said that his father involved him in extracurricular activities when he was ten or twelve years old, that he participated in a police sports program and took karate, and that he was involved in the "police explorers" program. She said that in high school, the Defendant worked in the guidance counselor's office and became a mentor for younger children in the family. She said that their family expected the children to be educated and to have a spiritual background, that they took the Defendant to Sunday school, and that the Defendant was involved in church youth activities and was a junior deacon. She said the Defendant worked at Chuck E. Cheese when he was a senior in high school and met the victim there.

Ms. Simmons testified that the Defendant joined the Marine Corps after he graduated from high school and was deployed to Iraq where he was injured. She said he returned to the United States, had surgery, recovered, and completed his service. She said that after he was discharged, he applied to become a police officer. She said that her family pushed the older children in the family to set good examples for the younger children and that they were a family of service, noting that she was a nurse and that the Defendant's father was a security guard.

Ms. Simmons testified that she sat in the courtroom and listened to the testimony and that her first reaction was to ask, "Who are they talking about? That is not what we raised." She said that after the Defendant returned from his service in the Marine Corps, he and the victim married and that the family was surprised because they were young, he was recently discharged from the military, and they had no life experience. She said that the family

accepted the victim into their hearts and family. She said that on the day of the victim's death, the Defendant's father lost a daughter, that she lost a niece, and that she was losing a nephew. She said that when the Defendant and the victim came to the family gatherings, they were happy, that they did not argue, and that no "gun drawing" occurred. She said she understood the couple was young and had financial problems. She said she did not know what the "fusses and running to friends" to discuss the relationship and the "sex texting" concerned. She said that the Defendant was a "wonderful nephew" and a "good person" in her family, that he was a good example, and that when the children in the family wrote school reports about heroes, they wrote about him. She said that after the Defendant married, he left to live his life and that she could not state what transpired after he left but that he was a good man when he left.

Timothy Cartmell, the Defendant's father, testified that he was present at the bond reduction hearing, the pretrial hearings, and every day of the trial and that he participated in raising his son. He said the Defendant had always been "mannerable," was raised in a loving family, joined the church when he was six years old, and always went to church. He said that the Defendant attended Metro schools and was quiet when he was younger. He said that as he aged, the Defendant gained confidence. He said the Defendant knew about discipline and earned his "three degree black belt" in Taekwondo. He said that in high school, the Defendant had many friends, loved school, joined the police explorers program, and knew he wanted to help others. He said that the Defendant did not have a day off work and was always helping his family. He said that the Defendant was the oldest of his three sons, that he was good to his brothers and set a good example, and that he was "easy to raise." He said the Defendant watched him work around the house and on cars and learned how to work on cars himself. He said that the Defendant joined the Marine Corps after he graduated from high school and that although he did not want the Defendant to join, the Defendant had a plan. He said that the Defendant never called to complain about his military training and that he was a good soon.

On cross-examination, Mr. Cartmell testified that the Defendant's mother was not around when the Defendant was young because she was incarcerated and that she was incarcerated at the time of the hearing. He agreed that other than his mother's absence, the Defendant had a good childhood and was loved and supported. He said that the Defendant had a strong upbringing and that they were still close. He denied knowing of other women the Defendant contacted when he was married. He said he, the victim, and the Defendant went to eat at a restaurant, that the couple liked the same type food, and that they joked with each other. He said he loved them both.

Mr. Cartmell testified that the Defendant was not a "pervert." He said that the Defendant was twenty-three or twenty-four years old and that he knew his son. He said that

-39-

the Defendant had many "facets" and that he was loving, witty, and "goofy." When asked if he knew the Defendant's new girlfriend, Allison, he stated that he knew Allison but did not know her as the Defendant's girlfriend. He said that he and Allison visited the Defendant in jail but that he had not heard the Defendant state he was in love with her.

At the conclusion of the sentencing hearing, the trial court found that the enhancement factor regarding the Defendant's employing a firearm during the commission of the offense was applicable. The court found that the Defendant had no previous criminal convictions or record but that testimony at the trial and at the sentencing hearing from Mr. Cole concerned other incidents that were "kind of in that category that you consider criminal kinds of behavior." The court stated, though, that it did not intend to give the criminal behavior a great deal of weight. The court noted that it did not find that the Defendant committed an act of perjury by testifying to a set of facts the jury did not credit and that no public or private trust was violated.

The trial court found that the Defendant's previous service in the Marine Corps was a mitigating factor but that his service as a police officer would not be given as much weight because of the circumstances of the case related to the Defendant's firing weapons in his house and other "bazaar" acts. The court stated that it would place more emphasis on the Defendant's four years in the Marine Corps. The court found that the enhancement factors raised the sentence above the minimum. The court noted that the "clear cause of this whole matter" was the careless and irresponsible use of the gun at the time of the victim's death and on previous occasions. The court stated that it was obvious the victim's mother and sister missed her terribly, that the Defendant's father and aunt were "good people," and that the day of the victim's death was a terrible day in all their lives. After balancing the enhancement and mitigating factors, the court ordered the Defendant to serve eighteen years.

The length of a sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *Bise*, 380 S.W.3d at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

Regarding the Defendant's using a firearm during the commission of the offense, the Defendant concedes in his brief that the enhancement factor applied. *See* T.C.A. § 40-35-114(9) ("The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense."). We agree that the trial court correctly applied this enhancement factor.

Regarding the Defendant's previous criminal behavior, the Defendant argues that the court erred in enhancing his sentence on this basis because the court did not establish on the record which criminal acts it found by a preponderance of the evidence that the Defendant committed. *See* T.C.A. § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range."). He argues that Ms. Barbour's and Mr. Cole's allegations were unsubstantiated, that no charges were filed, and that he did not have a criminal record. The Defendant's presentence report, which was admitted as an exhibit at the sentencing hearing, showed that he had no previous criminal convictions.

Although the trial court did not state which acts it found constituted criminal behavior, it referred to Mr. Cole's testimony at the sentencing hearing and other trial testimony. Mr. Cole testified that he was lying on his mother's bed when the Defendant approached, pointed a gun at him, and asked where was the victim's $20. Previous criminal acts may constitute criminal behavior even if there was no conviction. *See State v. Carico*, 968 S.W.2d 280, 288 (Tenn. 1998). Pointing a gun at someone in demanding payment of a debt is criminal behavior. "[E]nhancement is permissible when the episodes of criminal behavior are established by the testimony of witnesses." *State v. Anthony Joel Allen, Jr.*, No. 01C01-9612-CC-00514, slip op. at 6 (Tenn. Crim. App. May 7, 1998). The trial court credited Mr. Cole's testimony when it noted it in finding the criminal behavior enhancement factor applied. We note, though, that the court did not give this factor great weight.

A presumption of reasonableness is afforded to a sentence "within the appropriate statutory range." *Bise,* 380 S.W.3d at 707. The Defendant was convicted of second degree

murder, a Class A felony, and faced a sentence of fifteen to sixty years. *See* T.C.A. §§ 39-13-210(c); 40-35-111(b)(1) (2010). The court found two applicable enhancement factors, giving more weight to the Defendant's use of a gun in committing the offense than his previous criminal behavior, and two applicable mitigating factors, giving more weight to the Defendant's previous military service than his service as a police officer. The record reflects that the court considered the appropriate evidence from the trial and the sentencing hearing and properly applied the enhancement and mitigating factors. The Defendant's sentence is not invalid "[s]o long as there are other reasons consistent with the purposes and principles of sentencing[.]" *Bise*, 380 S.W.3d at 706. Given the circumstances of the Defendant's offense, we conclude that the trial court did not abuse its discretion in imposing the within-range, eighteen-year sentence. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE